STATE OF CONNECTICUT *v.* INDE FARIA
(AC 16684)

Lavery, Hennessy and Spallone, Js.

160

Argued June 9—officially released November 25, 1997

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Paul E. Murray*, supervisory assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

*Opinion*

SPALLONE, J. The defendant, Inde Faria, appeals[1] from the judgment of conviction, following a jury trial, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A),[2] attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49[3] and 53a-70 (a) (1),[4] and sexual assault in the third degree in violation of General Statutes § 53a-72 (a) (1) (A).[5] After the verdict of guilty on the three substantive offenses, the defendant pleaded guilty to being a persistent dangerous felony offender in violation of General Statutes § 53a-40 (a) (2) (A).[6] On appeal,

---

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023 and General Statutes § 51-199 (c), the Supreme Court transferred the appeal to this court.

[2] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

[3] General Statutes § 53a-49 provides in relevant part: "Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

[4] General Statutes § 53a-70 provides in relevant part: "Sexual assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[5] General Statutes § 53a-72a provides in relevant part: "Sexual assault in the third degree: Class D felony. (a) A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person . . . ."

[6] General Statutes § 53a-40 provides in relevant part: "Persistent offenders . . . . (a) A persistent dangerous felony offender is a person who (1) stands convicted of manslaughter, arson, kidnapping, sexual assault in the first or

the defendant claims that (1) the trial court improperly admitted evidence of other misconduct, (2) the trial court improperly refused to give a lesser included offense instruction, (3) the kidnapping statute is vague as applied to the facts of this case, and (4) there was insufficient evidence to support a conviction of first degree kidnapping. We agree with the defendant that the trial court improperly admitted evidence of uncharged misconduct and that the trial court improperly refused to give a lesser included offense instruction.[7] We therefore reverse the judgment of the trial court.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. The victim and her husband lived in an apartment complex on Crystal Avenue in New London at the same time that the defendant lived in the complex with his girlfriend. The defendant first spoke with the victim when he came into the business where she worked and applied for a job. She did not initially recognize him, but he recognized her and asked if she lived at the Crystal Avenue apartments. For several months after this meeting, the defendant and the victim occasionally had conversations in the parking area while the defendant worked on cars. Among other things, they discussed the victim's marital problems.

When the defendant moved from the complex, he gave the victim his pager number. Some time later, on

third degree, aggravated sexual assault in the first degree, sexual assault in the third degree with a firearm, robbery in the first or second degree, or assault in the first degree, and (2) has been, prior to the commission of the present crime, convicted of and imprisoned under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution, for any of the following crimes: (A) The crimes enumerated in subdivision (1) of this subsection, murder, or an attempt to commit any of said crimes or murder . . . ."

[7] We reach the defendant's second claim because the issue is likely to arise on retrial. Because we reverse the judgment on the defendant's first and second claims, however, we do not reach the defendant's vagueness claim.

April 11, 1995, the victim, after discussing it with her husband, paged the defendant to see if he could fix her car. The defendant called in response to the page and offered to look at the car. The victim then drove the car to the defendant's residence; her husband, who was not feeling well, stayed at their apartment.

The victim met the defendant at a grocery store, since she was not familiar with the area, and he led her to Myrock Avenue, a dead-end street in Waterford. The defendant was living there with a friend, Todd Cooms. When they arrived at Myrock Avenue, at around 6:30 or 7 p.m., it was still daylight.

For at least one hour, the defendant worked on the car while the victim watched. Cooms arrived and went into the residence. Before the defendant stopped working on the victim's car, Cooms' girlfriend, Laurie Sullivan, arrived. Cooms, Sullivan and the defendant decided to go to a pub nearby and invited the victim to join them. She agreed, and the defendant rode in the victim's car while Cooms rode in Sullivan's car.

They spent several hours at the pub, socializing and drinking beer and shots of liquor. During that time, the victim consumed two to three beers, and the defendant drank about six beers. The victim also had a sip of liquor, and the defendant had a shot and the remainder of the victim's shot. The victim and Sullivan spent most of the time talking, while Cooms and the defendant shot pool.

During the evening, the defendant told the victim how pretty she was and that it was a shame she was married. He also put his hand on her leg and, at one point, told her he was going to have to kiss her. At trial, the victim described his behavior as lewd and obnoxious. The victim "shrugged it off" and attributed the defendant's behavior to his consumption of alcohol.

She described the defendant as having a "buzz" but not being drunk.

At about 11 p.m., Sullivan said that she had to leave, and Cooms decided to drive her home because of her alcohol consumption. Cooms said that he would need a ride from her house. The victim agreed to follow him and the defendant rode with her.

Along the way, when they stopped for a soda at a convenience store, the defendant tried to kiss the victim and touched her breast. She pulled away from him and pushed away his hand. She testified that she was not concerned because she felt able to take care of herself.

After Cooms dropped off Sullivan and her car, the three returned to the pub. The victim had another beer and the defendant had several more beers. They left the pub at around midnight.

The victim drove Cooms and the defendant to their residence on Myrock Avenue. There, the defendant, who was sitting in the front passenger seat, told Cooms to get out, which he did. The defendant asked the victim to drive to the end of the cul-de-sac about one quarter of a mile away, which she did. When she had gone about three quarters of the way around the circle at the end of the street, the defendant asked her to stop. Thinking the defendant was about to apologize for his earlier conduct, she stopped the car but left the engine running with the transmission in gear and the clutch depressed.

The defendant put his hand behind the back of the victim's head and tried to kiss her. She said no. He looked in her eyes and appeared to hesitate three times before finally saying, "How about just a blow job?" The victim responded, "Ah, you're drunk. No, I don't think so, you know." The defendant forcefully grabbed her hair on the back of her head and pulled her over the

car console toward his lap. With his other hand, he groped her breasts and crotch. Two or three times, he tried to force the victim's head into his lap. She told him no and tried to push away and turned her head away from him. During most of the struggle, the defendant held her by her hair.

They argued and fought, and the victim eventually released the clutch, causing the car to stall. She asked that he leave the car but he would not. Two or three times, she tried to reach for the door, but he pulled her back by her hair. Fifteen to twenty minutes after the struggle began, she succeeded in opening the door and got her feet out. The defendant grabbed her by her hair and shirt, and she "pushed and pulled with everything [she] had." Her shirt ripped in the defendant's hand as she exited the car.

After escaping, the victim ran. She started toward the convenience store but, realizing it would be closed, ran to Cooms' house. She told Cooms that the defendant tried to rape her. Cooms saw that she was crying and distraught, and her shirt was torn. Moments later, the defendant came to the door. The victim asked that Cooms not let him in, but Cooms said that he had to, since the defendant lived there. The defendant tried to apologize. The defendant held her, stroking the back of her hair, as he told her he was sorry. She cried and was "petrified, and anything that [she] could do to get closer to the outside door [she] would do." The defendant offered to walk her home, but she refused and Cooms walked with her. Cooms felt that she was too upset to drive and drove her home in her car. When they went by the the defendant's residence, his pickup truck, which had been there moments earlier, was gone.

Cooms went into the victim's home and explained to her husband what had happened. The police were

called. The Waterford officer who interviewed the victim observed that her shirt was torn and that she had pronounced red marks on her left wrist. The victim, her husband, Cooms and the investigating officer arrived at the Waterford police station at approximately 1:40 a.m. At that same time, the officer was notified by radio that the defendant had been stopped by another officer and was being detained at an intersection in New London. The officer took the victim in his police car to that location, where she immediately identified the defendant and began to cry uncontrollably.

The Waterford police officer who stopped the defendant had observed the defendant's pickup truck occupied by two individuals on Willets Avenue. Hope Becker and the defendant were the occupants of the truck. The officer did not observe any erratic operation, and the defendant pulled to the curb in an orderly fashion. The defendant was responsive to the officer's directions, gave his license as requested and responded appropriately to inquiries. After the officer transported the defendant to the Waterford police department, he became uncooperative and was placed in a cell. The officer concluded that the defendant's demeanor might have been partially related to the alcohol he had consumed. At about 2:30 a.m., when the officers went to see if the defendant had calmed down, they could not rouse him.

Hope Becker was a prostitute with a drug habit who admitted to having consensual sex with the defendant in the early morning of April 12, 1995, after the incident with the victim. She had felony convictions for narcotics violations and for a failure to appear, and was on probation with other criminal charges pending at the time the defendant was arrested. She had used cocaine on the night of April 11 but was no longer high when she was with the defendant. At approximately 1 a.m., on April 12, the defendant solicited her for prostitution in

front of her residence on Jay Street in New London. She agreed to perform oral sex for $20. She entered his pickup truck, and he drove to Myrock Avenue, stopping first at an automatic teller machine to get $20. The defendant proceeded to the end of the cul-de-sac, where he stopped the truck. The defendant had Becker get on the floor of the truck. She testified that the defendant was "very dominant, very aggressive to the point that he scared me." She said the defendant "had a hold on the back of my head and his fingers entwined in my hair, very roughly. When I would try to pull my head up, he would force my head back down, very aggressive. I was crying. I asked to stop. You know, let me catch my breath for a second. And he was telling me that I had been paid. You know, do my job." After she finished, she apologized for her conduct "because I didn't feel it was professional. But I did explain to him that I had recently been raped, and that I was very touchy, and skittish and that he scared me." The defendant apologized for scaring her. He was driving her back to her residence when he was stopped by police.

At trial, the state offered Becker's testimony to prove motive and intent and also to show that the defendant had used force against the victim earlier that night. The trial court initially excluded the testimony but, following a request to reconsider its ruling, the trial court reversed its earlier ruling and allowed the evidence.

I

The defendant's first claim is that the trial court improperly admitted into evidence testimony of misconduct concerning his patronizing a prostitute.[8] The defendant argues that the evidence of the other misconduct

---

[8] General Statutes § 53a-83 provides: "Patronizing a prostitute: Class A misdemeanor. (a) A person is guilty of patronizing a prostitute when: (1) Pursuant to a prior understanding, he pays a fee to another person as compensation for such person or a third person having engaged in sexual conduct with him; or (2) he pays or agrees to pay a fee to another person

is not relevant to intent or motive involving sexual assault in the first degree or kidnapping in the first degree. The basis of the defendant's argument is that evidence involving consensual sex is not relevant to proving compelled sex. The defendant claims that Becker's testimony had no bearing on the defendant's motive or intent for kidnapping and sexual assault because, since the state admitted that Becker acted under her own free will, there was no evidence of force used to compel sexual intercourse. The defendant asserts that the state's claim that the sexual assault was motivated by a desire for sexual gratification is flawed because the gravamen of the crime of sexual assault is the use of force to compel sexual acts. The intent required for sexual assault is not sexual gratification but the intent to use force. Citing *State* v. *Bowman*, 3 Conn. App. 148, 153, 485 A.2d 1343 (1985),[9] the defendant states that "[t]he absence of the use of force to compel Becker to engage in intercourse makes the motive for and intent behind this misconduct completely different from that the state sought to prove in the charged offense." The defendant also argues that the trial court abused its discretion in concluding that the probative value of the other misconduct evidence outweighed its prejudicial effect, especially because the misconduct involved a drug-addicted prostitute.

Evidence of other misconduct "is inadmissible to prove that a defendant is guilty of the crime charged

pursuant to an understanding that in return therefor such person or a third person will engage in sexual conduct with him; or (3) he solicits or requests another person to engage in sexual conduct with him in return for a fee.

"(b) Patronizing a prostitute is a class A misdemeanor."

[9] The evidence of other misconduct in *Bowman* was offered not to prove intent or motive but to show the existence of a common plan or scheme. Nonetheless, in that context, we ruled that "[t]he alleged prior misconduct must show, in cases involving sexual assault in the first degree, that the common scheme involved the use or threatened use of force in order to compel sexual intercourse." *State* v. *Bowman*, supra, 3 Conn. App. 153.

against him. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 161, 665 A.2d 63 (1995); see *State* v. *Harris*, 43 Conn. App. 830, 835–37, 687 A.2d 544 (1996). There are exceptions to the general rule; such evidence is admissible for other purposes, such as to show identity, malice or a system of criminal activity, or an element of the crime. *State* v. *Figueroa*, supra, 162; *State* v. *Harris*, supra, 836.

One exception to the general rule of inadmissibility of other misconduct evidence is that such evidence is admissible to prove motive. "[T]here are two components to relevant evidence: materiality and probative value. . . . [E]vidence is relevant if it has a tendency to establish the existence of a material fact. . . . Evidence of motive is a highly relevant factor for assessing the guilt or innocence of a defendant. . . . [E]vidence otherwise relevant and material is not rendered inadmissible because it tends to prove that an accused committed other crimes." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 42 Conn. App. 41, 49, 680 A.2d 1340 (1996). " 'Motive is a fact which may be inferred from circumstances; hence the circumstances from which it may be inferred are relevant.' " (Internal quotation marks omitted.) *State* v. *Jenkins*, 24 Conn. App. 330, 336, 588 A.2d 648, cert. denied, 219 Conn. 903, 593 A.2d 132 (1991).

Another exception is that such evidence is admissible to show intent. "Intent, or any other essential element of a crime, is always at issue unless directly and explicitly admitted before the trier of fact." *State* v. *Baldwin*, 224 Conn. 347, 356, 618 A.2d 513 (1993). "Because intent is almost always proved, if at all, by circumstantial

evidence, [other] misconduct evidence, where available, is often relied upon." Id., 355.

Whether evidence of other misconduct is admissible depends on a two part test: (1) the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions to the propensity rule, and (2) the probative value of such evidence must outweigh the prejudicial effect. *State* v. *Figueroa,* supra, 235 Conn. 162; *State* v. *Madore,* 45 Conn. App. 512, 519, 696 A.2d 1293 (1997).

The state argues that the evidence of the other misconduct is relevant to intent and motive. Although admitting that "[s]exual assault is generally a crime of dominance and violence, not of passion," the state, in its brief, contends that the evidence is probative and that its probative value outweighs its prejudicial impact. The state argues that the evidence has probative value for two reasons. First, the state argues that it is probative because of the similarities between the charged and uncharged offenses. These similarities concern the particular sex act referred to in both instances, the location, i.e., the end of the cul-de-sac on Myrock Avenue, the positions of the persons within the vehicles, the defendant's manner of grabbing the hair of the two women and the defendant's aggressiveness. Second, the state claims that Becker's characterization of the defendant's conduct toward her as "dominant" and "very aggressive" shows a motive to achieve sexual gratification by force and an intent to achieve that goal. While recognizing that "it is a close call"; *State* v. *Cooper,* 227 Conn. 417, 426, 630 A.2d 1043 (1993); we agree with the state because we cannot conclude that the trial court abused its broad discretion when it concluded that the evidence was relevant and material to at least one of the circumstances encompassed by the exceptions to the propensity rule.

The defendant asserts that, in general, the usual motive of perpetrators of sexual assault is to exert violence upon and to exercise control of a victim, and that the intent is to gain a sense of power and not to achieve sexual gratification.[10] Even if we assume, arguendo, that that is true, here the other misconduct evidence showed that the defendant's conduct was "dominant" and "aggressive" toward an intended female object of this aggression, that the defendant held her hair tightly and otherwise treated Becker roughly, and that the defendant told Becker to do something that because of her attempt to stop and her tears, she appeared at least for a short time unwilling to do. We cannot conclude that the trial court was incorrect in ruling that the evidence may have tended to show that the defendant had the intent to exert aggressive or violent control and that his intent was to achieve a sense of dominance, via a particular method, over persons with less power.

The cases cited by the defendant are more applicable to the admissibility of evidence of a common scheme than, as here, to the admissibility of evidence of motive and intent. Both our Supreme Court and this court have

---

[10] In his brief, the defendant, quoting A. Nicholas Groth, Men Who Rape— The Psychology Of The Offender (1979) p. 2, states that "the defining characteristic from the victim's point of view is force and from the offender's point of view it is a release of anger and the exercise of power and control. 'A number of popular notions and stereotyped images persist in regard to the offender, his victim, and the offense. With regard to the offender, he is frequently regarded as a lusty male who is the victim of a provocative and vindictive woman, or he is seen as a sexually frustrated man reacting under the pressure of his pent-up needs, or he is thought to be a demented sex-fiend harboring insatiable and perverted desires. All these views share a common misconception: they all assume that the offender's behavior is *primarily* motivated by *sexual* desire and that rape is directed toward gratifying the sexual need. Quite to the contrary, careful clinical study of offenders reveals that rape is in fact servicing primarily nonsexual needs. Rape is a pseudosexual act . . . addressing issues of hostility (anger) and control (power) more than passion (sexuality).'" (Emphasis in original.) The defendant argues that, "[s]tripped of this false assumption, Becker's testimony shows only a propensity to engage in bad acts."

commented on the admissibility of evidence of consensual sexual conduct in cases involving charges of nonconsensual sexual conduct. Specifically, the Supreme Court in *State* v. *Esposito*, 192 Conn. 166, 172–73, 471 A.2d 949 (1984), stated that "[i]f the common plan or scheme of the actor embraces compelled sexual intercourse then evidence tending to show the common scheme will also tend to establish the doing of the forbidden conduct. . . . Since conceptually compulsion and consent are antonymous in effect, if not in meaning, it would follow that any act engaged in under compulsion would necessarily be nonconsensual. In that sense *evidence of a common plan or scheme to engage in compelled sexual intercourse* would tend to negate a defense of consent." (Citations omitted; emphasis added.) This court has required that other misconduct evidence, in cases involving sexual assault in the first degree, show that "the *common scheme* involved the use or threatened use of force in order to compel sexual intercourse." (Emphasis added.) *State* v. *Bowman*, supra, 3 Conn. App. 153. Neither court, however, has extended the applicability of their holdings beyond cases in which misconduct evidence is offered to show a common scheme or plan. Furthermore, as the defendant concedes in his brief, a lesser degree of similarity between the other misconduct evidence and the charged offenses is required where the other misconduct evidence is used to show motive and intent. See *State* v. *Morowitz*, 200 Conn. 440, 445, 512 A.2d 175 (1986).

The second part of the propensity exception test is a determination of whether the probative value of the evidence outweighed its prejudicial impact. *State* v. *Figueroa*, supra, 235 Conn. 166–67; *State* v. *Madore*, supra, 45 Conn. App. 522. We conclude that the trial court abused its discretion in ruling that the probative

value of the other misconduct evidence outweighed its prejudicial impact.

Though the evidence was probative, its probative value was minimal. There are considerable dissimilarities between the two incidents. There was no evidence that the victim and Becker were similar in appearance or otherwise. The evidence showed some normal social interaction between the victim and the defendant prior to the incident in question, while it showed little more than a business transaction between the defendant and Becker. The victim testified that she knew the defendant before the incident; Becker did not. Most significantly, the other misconduct evidence represented an act on the part of the defendant that may have indicated to the jurors that he had a propensity to commit various sexual misconduct. "It is precisely this type of evidence which may permit the jury to draw the erroneous and prejudicial inference which the rule is meant to avoid." *State* v. *Williams*, 190 Conn. 104, 109, 459 A.2d 510 (1983).

We recognize that "[t]he primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion"; *State* v. *Figueroa*, supra, 235 Conn. 162; see *State* v. *Harris*, supra, 43 Conn. App. 837; or where injustice appears to have been done. *State* v. *Falby*, 187 Conn. 6, 23, 444 A.2d 213 (1982); *State* v. *Jenkins*, supra, 24 Conn. App. 336–37. Nonetheless, "[i]n admitting such evidence, the trial court's discretion is limited. . . . The trial court's discretion to admit other [misconduct] evidence imports something more than leeway in decision-making. Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . When assessing the admissibility of other [misconduct] evidence, the application

of a mechanical test determining that the proffered evidence fits within some class of exception to the rule of nonadmissibility, may obscure sight of the underlying policy of protecting the accused against unfair prejudice. That policy ought not to evaporate through the interstices of the classification." (Citation omitted; internal quotation marks omitted.) *State* v. *Baldwin,* supra, 224 Conn. 356–57; *State* v. *Busque,* 31 Conn. App. 120, 129–30, 623 A.2d 532 (1993), appeal dismissed, 229 Conn. 839, 643 A.2d 1281 (1994).

In reviewing a trial court's decision concerning the probative-prejudicial balance, "[w]e must determine whether the trial court properly balanced the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Internal quotation marks omitted.) *State* v. *Busque,* supra, 31 Conn. App. 130. Here, as noted, the other misconduct evidence had limited probative value. The admission of such evidence created a very strong likelihood that the jury's emotions were unduly roused.[11] "[R]elevant evidence that is potentially prejudicial should be excluded . . . where the facts offered may unduly arouse the jury's emotions, hostility or sympathy . . . ." (Internal quotation marks omitted.) *State* v. *Jenkins,* supra, 24 Conn. App. 337; see also *State* v. *Busque,* supra, 130–31. " 'Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous.' " *State* v. *Jenkins,* supra, 337. In this case, the other misconduct evidence included considerable evidence that was extraneous to the charged crime. For example,

---

[11] The trial court, in sustaining the defendant's objection to the admission of the other misconduct evidence prior to reversing that ruling, admitted that the prejudicial impact of the evidence was high, despite the evidence's probative value. Said the trial court: "[W]hile it may be probative, I'm afraid it is so highly prejudicial that I don't think [the] Appellate Court would sustain it."

there was evidence that the defendant had sex with a prostitute, that the prostitute was drug-addicted, that the prostitute had been recently raped and that the defendant had scared the prostitute. "Evidence is prejudicial 'when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.' *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)." *State* v. *Baldwin*, supra, 224 Conn. 357. Much of this evidence was extraneous and was likely to rouse unduly the jury's emotions.

We conclude, therefore, that the prejudicial effect of the other misconduct evidence outweighed its minimal probative value and that its admission into evidence constituted an abuse of the trial court's discretion.

"Although we conclude that the trial court improperly admitted the evidence of the defendant's prior misconduct, we must determine whether the trial court's decision was harmful. In a case involving an evidentiary ruling, it is the defendant's burden to show that it is more probable than not that the court's action affected the result." *State* v. *Busque*, supra, 31 Conn. App. 131, citing *State* v. *Sierra*, 213 Conn. 422, 436, 568 A.2d 448 (1990). Some degree of prejudice inevitably accompanies the admission of evidence of a defendant's other misconduct. See *State* v. *Nardini*, 187 Conn. 513, 523, 447 A.2d 396 (1982). Here, because the evidence improperly admitted was so potentially prejudicial, we cannot conclude that it was harmless. The prejudicial effect of the other misconduct evidence is apparent. "Any improper evidence that may have a tendency to excite the passions, awaken the sympathy, or influence the judgment, of the jury, cannot be considered as harmless." (Internal quotation marks omitted.) *State* v. *Sierra*, supra, 437; *State* v. *Williams*, supra, 190 Conn. 109; *State* v. *Busque*, supra, 131–32. We conclude that it is more probable than not that it unduly influenced

the jury to believe the defendant had a proclivity to commit acts of sexual misconduct.

## II

The defendant also claims that the trial court improperly denied his request to charge the jury on unlawful restraint in the second degree as a lesser included offense of kidnapping in the first degree.[12] The defendant argues that the specific intent required by the

---

[12] The defendant's requested instruction regarding unlawful restraint in the second degree read as follows:

"REQUESTS TO CHARGE

The defendant hereby requests that the jury charge include the following separate charges. (All are derived from Connecticut Selected Jury Instructions, Criminal 1995):

1. § 2.35 Intoxication § 53a-7 (as modified by the defendant): There has been some testimony to the effect that the defendant was under the influence of an intoxicant, namely, alcohol, at the time of the alleged acts. The Penal Code defines intoxication as a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body.

If you find that the defendant was under the influence of an intoxicant at the time of the alleged acts, you must then determine what effect, if any, this voluntary intoxication had on his ability to form the specific intent required to commit the alleged crimes. Penal Code § 53a-7 states that 'Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged . . . .' Such evidence was offered through examination and cross-examination of the State's witnesses.

Note that intoxication is not a defense to or an excuse for the commission of a crime. It is only relevant to negate an element of the crime charged, such as intent. If you find that the defendant was intoxicated at the time of the crime, you may take this fact into consideration in determining whether he was in such a state of intoxication as to be incapable of forming the required specific intent, which is a necessary element for the commission of the crimes of Kidnapping in the First Degree and Attempt to Commit Sexual Assault the First Degree.

I charge you further that if you believe that the defendant, although intoxicated, was still capable of possessing a specific criminal intent, then his responsibility is the same as if he were not intoxicated. You must first decide whether the defendant was intoxicated at the time of the alleged crime; and second, whether he was incapable of possessing an intent to commit the acts constituting the crimes of Kidnapping in the First Degree and Attempt to Commit Sexual Assault in the First Degree. Remember, the

kidnapping statute was negated by the defendant's intoxication at the time and, therefore, he could have been found guilty merely of unlawful restraint of the victim.

"There is no fundamental constitutional right to a jury instruction on every lesser included offense . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 260, 681 A.2d 922 (1996). Rather, "[a] defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is

defendant does not have to prove that he was intoxicated. The state always has the burden of proving beyond a reasonable doubt that the defendant was capable of forming the required intent. Any degree of intoxication, not merely total intoxication, may be considered in determining whether the defendant possessed the requisite intent.

\* \* \*

3. § 2.5 Lesser Included Offense (as modified by the defendant): Under the first count, the defendant is charged with the crime of Kidnapping in the First Degree. If you find that the state has proven beyond a reasonable doubt each of the essential elements of this crime of Kidnapping in the First Degree, you shall find the defendant guilty of the crime of Kidnapping in the First Degree under the first count.

However, if you find the defendant not guilty of the crime of Kidnapping in the First Degree under this count, you shall then consider the lesser offense of Unlawful Restraint in the Second Degree under the first count.

4. § 6.36 Unlawful Restraint—Second Degree § 53a-96 (as modified by the defendant): Unlawful restraint in the second degree in violation of § 53a-96 of the Penal Code, provides as follows: 'A person is guilty of unlawful restraint in the second degree when he restrains another person.'

For you to find the defendant guilty of this charge, the state must prove beyond a reasonable doubt that the defendant restrained the victim.

'Restraint' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences, or in a place to which he has been moved, without consent. As used herein, 'without consent' means, but it is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement. . . ."

not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof of the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980).

"In considering whether the defendant has satisfied the requirements set forth in *State* v. *Whistnant,* supra, [179 Conn. 588], we view the evidence in the light most favorable to the defendant's request for a charge on the lesser included offense. . . . [T]he jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested. . . . Otherwise the defendant would lose the right to have the jury pass upon every factual issue fairly presented by the evidence. . . . If we cannot exclude, as a matter of law, the possibility that the defendant is guilty only of the lesser offense, we must conclude that the trial court's failure to give the requested instruction is improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Abdalaziz,* 45 Conn. App. 591, 595–96, 696 A.2d 1310, cert. granted on other grounds, 243 Conn. 902, 701 A.2d 334 (1997).

The defendant claims that under *Whistnant* he was entitled to a lesser included offense of unlawful restraint in the second degree. The state concedes that the second and third prongs of *Whistnant* are met.[13]

---

[13] No Connecticut appellate court has held that unlawful restraint in the second degree is a lesser included offense of kidnapping in the first degree. Our Supreme Court, however, has held that unlawful restraint in the second

The state argues, however, that the first and fourth prongs of *Whistnant* are not satisfied by the facts of this case.

### A

Under the first prong of *Whistnant*, we must determine whether the request to charge constituted an appropriate instruction.

After making its request, the defendant cited to a case that held that unlawful restraint was a lesser included offense of kidnapping in the second degree.[14] The defendant now concedes that he did not cite to any case law and referred only to A. Ment & R. Fracasse, Connecticut Selected Jury Instructions: Criminal (3d Ed. 1995), and the appropriate statutes. Nonetheless, the defendant claims that the trial court had discussed the issue with the prosecutor and the defendant's counsel in chambers, was aware of the defendant's request prior to formulating its charge, was thus afforded the time[15] to scrutinize the requests and investigate the relevant case law and, therefore, knew the precise point to which the defendant wanted to call attention.[16] See *State* v. *Arena,*

---

degree is a lesser included offense of kidnapping in the second degree. In *State* v. *Vass,* 191 Conn. 604, 618, 469 A.2d 767 (1983), the court said that the definition of unlawful restraint, "restraint of another person, does fall within the ambit of the crime of kidnapping [in the second degree] . . . ." For the same reason, we hold that unlawful restraint in the second degree falls within the definition of the crime of kidnapping in the first degree.

[14] At the time, the defendant did not name or provide citation to the case, which is *State* v. *Vass,* supra, 191 Conn. 604.

[15] The trial court asked counsel to meet in chambers at the end of the court's February 21, 1996 session. The court reconvened the next day.

[16] The following exchange took place at the time of the request to charge:

"The Court: Anything further?

"[Defense Counsel]: I have some requests to charge that I had my secretary type up and bring down here. If Your Honor wants those now I'll—

"The Court: Yeah, all right. Bring them in chambers. Well, file them with the clerk.

"[Defense Counsel]: I did not proofread them.

"The Court: Does the state have any?

"[Assistant State's Attorney]: No, Your Honor.

"The Court: Are there any lesser includes?

"[Defense Counsel]: I'm requesting.

"[Assistant State's Attorney]: I'm not asking for any, but I'll look at counsel's request.

"The Court: All right. We'll discuss—Is there an intoxication charge?

"[Defense Counsel]: Yes.

"The Court: What else do you have there?

"[Defense Counsel]: Intoxication, failure to testify, defendant's failure to testify, which I assume you're going to give anyways.

"The Court: That's a required—yeah.

"[Defense Counsel]: Lesser included offense of unlawful restraint in the second degree on the kidnapping and—

"The Court: Do you have any case law that says that's one?

"[Defense Counsel]: Well, I just looked at the elements, Your Honor, and it seems clear that all there is is restraint.

"The Court: Yeah, but do you have any cases that says that it is or isn't?

"[Defense Counsel]: I don't believe so. I saw that there was a case going from kidnapping second to unlawful second. But not from kidnapping one to unlawful second.

"The Court: All right.

\* \* \*

"The Court: Let me ask you, what are the requirements for a lesser included?

"[Defense Counsel]: It has to be something that would necessarily have to occur in order for the higher charge to occur.

"The Court: No, no, no. What are the four elements in *Whistnant*, one of which one of the parties has to request the charge. What else?

"[Assistant State's Attorney]: The facts—

"The Court: The obvious thing is that the elements of the lesser must have been committed in order to constitute the greater.

"[Defense Counsel]: It has to be—

"The Court: What about the fact dispute here? Is it really an issue?

"[Defense Counsel]: Well, yes.

"The Court: Okay. That's enough for me. How is it, you know, how is it an issue?

"[Defense Counsel]: There's an issue whether or not he, by her credibility, which I intend to address in my closing, whether she's believable on any of these issues, whether she's believable enough to—

"The Court: So the one thing about *Whistnant*, every case there's a lesser included.

"[Defense Counsel]: Well, no. Your Honor, give me a chance to go through the whole thing. She is saying that he made these statements. And that I assume would be part of the argument as to the intent to commit sexual assault in the first degree.

"The Court: You may be seated. You don't have to stand.

"[Defense Counsel]: And yet she's also making claims in her statement

235 Conn. 67, 75–77, 663 A.2d 972 (1995). The defendant also argues that the trial court cut off the defendant's explanation of the grounds justifying the request, did not pursue the matter after a break for conference in chambers, and did not specifically rely on the lack of justifying grounds in its decision to deny the request. Thus, contends the defendant, there was no finding by the trial court, nor can there be any showing, of noncompliance with Practice Book § 854.

"A proposed instruction on a lesser included offense constitutes an appropriate instruction for purposes of the first prong of *Whistnant* if it complies with Practice Book § 854." (Internal quotation marks omitted.) *State* v. *Tomasko*, supra, 238 Conn. 261. Practice Book § 854 provides that "[w]hen there are several requests [to charge], they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based and, if requested by the judicial authority, the evidence to which the proposition would apply. . . ."[17] "[I]n the context of a written request to charge on a lesser included offense, this requirement of § 854 is met only if the proposed request contains such a complete statement of the essential facts as would have justified the court in charging in the form requested." (Internal quotation marks omitted.) *State* v. *Tomasko*, supra, 261–62.

"While this court does not favor unyielding adherence to rules of procedure where the interests of justice are thereby disserved . . . the ever increasing refinement of our law justifies cooperation of counsel in stating

about him struggling around and touching her various private parts. It may be that that is—that the jury will find that that's the only credible part of her testimony.

"The Court: I'll see you people in chambers."

[17] Practice Book § 854 was amended in 1995, when the "if requested by the judicial authority" language was inserted.

requests for jury instruction. The minor burden of cooperation imposed by [Practice Book § 854] is neither unreasonable nor novel." (Internal quotation marks omitted.) Id., 262.

One element of General Statutes § 53a-92 (a) (2) (A) is that the actor have the intent to "inflict physical injury upon [another person] or violate or abuse him sexually . . . ." General Statutes § 53a-96 (a),[18] unlawful restraint in the second degree, requires an intent only to restrain another person. See General Statutes § 53a-91.[19] The defendant now contends that the defendant's intoxication negated any possible specific intent required by the kidnapping statute.

Although the defendant's request did not contain a complete statement of the facts that would have justified the court in charging in the form requested; cf. *State* v. *Arena*, supra, 235 Conn. 76; we cannot conclude that the trial court was unaware of the legal and factual basis for the request to charge. We reach this conclusion for two reasons. First, in the midst of a discussion about the legal and factual justification for the request, the

[18] General Statutes § 53a-96 (a) provides: "A person is guilty of unlawful restraint in the second degree when he restrains another person."

[19] General Statutes § 53a-91 provides in relevant part: "Definitions. The following definitions are applicable to this part:

"(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein, 'without consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement.

"(2) 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation. . . ."

trial court called counsel for the state and the defendant into chambers. Once the court resumed, there was no additional questioning from the trial court about the basis for the request. The inference is that "this issue [had] been discussed in chambers"; id., 77; and whatever questions the court had may have been answered in chambers. Because that discussion is not part of the record, we cannot determine that those questions were left unanswered or that the trial court did not have the opportunity to inquire into the legal and factual grounds for the request. Therefore, on the basis of the facts before us in this case, we presume that the trial court was aware of the defendant's request and the point to which the defendant wanted to call attention "and thus was afforded the time to scrutinize the requests and investigate the relevant case law." Id. Second, the trial court itself interrupted the defendant's counsel's explanation of the grounds for the request. It would be unfair to allow a trial court to interfere with a defendant's attempt to meet the requirements of § 854 and then to conclude that the sole basis for the defendant's failure to meet those requirements was an inadequate answer.

On that basis, we conclude that the trial court was made aware of the basis for the defendant's request to charge. We conclude that the defendant's request charge was not inappropriate and, therefore, satisfied the first prong of *Whistnant*.

### B

Having determined that the defendant has met the first prong of *Whistnant*, we next must determine whether the proof on the element or elements that differentiate conviction of unlawful restraint in the second degree from conviction of kidnapping in the first degree was sufficiently in dispute. Proof is sufficiently in dispute when "it is of such a factual quality that [it] would permit the finder of fact reasonably to find the

defendant guilty on the lesser included offense." (Internal quotation marks omitted.) *State* v. *Collins*, 45 Conn. App. 6, 10, 692 A.2d 865 (1997).

To obtain a conviction on unlawful restraint in the second degree in this case, the state would have been required to prove that the defendant "restrained" the victim within the meaning of the statute. See General Statutes § 53a-96 (a). Thus, the state would have had to prove that the defendant restricted the victim's movements intentionally in such a manner as to interfere substantially with her liberty by confining her to the place where the restriction began without her consent. See General Statutes § 53a-91 (1). Those elements differ from the elements of kidnapping in the first degree. Under the kidnapping statute, the state had to prove that the defendant abducted and restrained the victim with the intent to inflict physical injury or to sexually attack her. See General Statutes § 53a-92 (a) (2) (A). The state had to prove that the defendant abducted the victim by restraining her with the intent to prevent her liberation by using or threatening to use physical force or intimidation. See General Statutes § 53a-91 (2).

In the present case, the victim testified that when she attempted to flee, she was held by her shirt and was able to free herself only by pulling away so hard as to rip her shirt. She testified that prior to fleeing, she attempted to reach for the door several times but was pulled back by the defendant, who grabbed her hair. Thus, the state claims that there was no evidence presented to the jury that the victim was restrained in any other way than by physical force or intimidation. Additionally, the state claims that with respect to the defendant's argument that his intoxication negated the specific intent to prevent the victim's liberation, there was evidence showing that the defendant was able to get in his truck, to drive to New London, to use an

automatic teller machine and to drive back to Myrock Avenue.

The state's claims, however, are not pertinent to the question of whether the proof offered on the defendant's intent would have allowed the jury to find him guilty of merely unlawfully restraining the victim rather than kidnapping her. The evidence included testimony—from Cooms, the victim and two investigating officers—about the defendant's consumption of alcohol.[20] It also included testimony of the victim that she believed at least during part of that night that the defendant's behavior was affected by his alcohol consumption.[21] The trial court found enough evidence of the defendant's intoxication to charge the jury on the issue.[22] Viewed in the light most favorable to the defendant's request to charge on the lesser included offense,

[20] Officer Edward DeLaura of the Waterford police department testified that he detected an odor of alcohol about the defendant during his booking and that the defendant was "fairly coherent." He also said, "I don't believe I viewed him long enough to make a determination or spoke to him at length to determine his level of intoxication. His eyes were bloodshot, and he did have an odor of alcohol, alcoholic beverages."

Officer Herbert Eldridge III of the Waterford police department testified that the defendant "would have been arrested for DWI [driving while intoxicated] had he been operating in our jurisdiction, but I couldn't take any DWI—because I did not actually see him in the town of Waterford operating in New London." He also said that the defendant passed out in his detention cell and that he and another officer were unable to wake him up.

[21] For instance, the victim testified that she assumed she was finally able to get her hand on the car door because of the defendant's state of intoxication. Also, when asked whether she thought the defendant was intoxicated while they were at the pub, the victim said: "It depends on your definition of intoxicated. I would say in my opinion he had a buzz, but I wouldn't say that he was drunk."

[22] The trial court charged the jury on the issue of intoxication as follows: "There has been some testimony to the effect that the defendant was under the influence of an intoxicant, namely, alcohol, at the time of the events here. Our law defines intoxication as a substantial disturbance of mental or physical capacities resulting from the introduction of substances like alcohol into the body. If you find the defendant was under the influence of alcohol at the time of the alleged acts, you must then determine what effect, if any, this voluntary intoxication had on his ability to form the specific

that evidence would have been sufficient to allow the jury reasonably to have concluded that the defendant's intoxication prevented his forming the specific intent required by the kidnapping statute.

The defendant satisfied the fourth prong of *Whistnant* because we cannot exclude the possibility that he is guilty of the lesser offense and not the greater. We conclude that the trial court improperly failed to give the requested instruction.

## III

The defendant's final claim is that the evidence was insufficient to support a conviction of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A).

"We employ a two part analysis in reviewing the sufficiency of the evidence to sustain a criminal conviction. . . . First, we construe the evidence in the light

intent required to commit the crimes alleged in counts one and two. Our penal code states, 'Intoxication shall not be a defense to a criminal charge. But in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged.' Again, note, intoxication is not a defense or an excuse for the commission of a crime. It is only relevant to negate an element of the crime charged such as intent. If you find that the defendant was intoxicated at the relevant time, you may take this fact into consideration in determining whether he was in such a state of intoxication as to be incapable of forming the required specific intent which is a necessary element for the commission of the crime of kidnapping in the first degree and criminal attempt to commit sexual assault in the first degree.

"I charge you further that if you believe that the defendant, although intoxicated, was still capable of possessing a specific criminal intent then his responsibility is the same as if he were not intoxicated. You must first decide whether the defendant was intoxicated at the time of the alleged crimes and, second, whether he was incapable of possessing an intent to commit the acts constituting the crimes of kidnapping in the first degree and criminal attempt to commit sexual assault in the first degree. Remember, the defendant does not have to prove that he was intoxicated. The state always has the burden of proving beyond a reasonable doubt that the defendant was capable of forming the required intent. Any degree of intoxication, not merely total intoxication, may be consider[ed] in determining whether the defendant possessed the requisite intent."

most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Roy*, 38 Conn. App. 481, 488, 662 A.2d 799 (1995), cert. denied, 237 Conn. 902, 674 A.2d 1333 (1996); *State* v. *Coleman*, 35 Conn. App. 279, 293, 646 A.2d 213, cert. denied, 231 Conn. 928, 648 A.2d 879 (1994).

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." (Citation omitted; internal quotation marks omitted.) *State* v. *Alford*, 37 Conn. App. 180, 184, 655 A.2d 782, cert. denied, 234 Conn. 914, 660 A.2d 357 (1995).

The jury heard evidence that the defendant grabbed the victim and attempted two or three times to force her head into his lap, and that she resisted. The jury also heard evidence that the struggle between the victim and the defendant went on for fifteen to twenty minutes, that the victim tried two or three times to reach for the car door and that the defendant forcibly held her back

by her hair. The jury also heard evidence that the defendant, after the victim got the door opened and got her feet out the door, grabbed her by her hair and her shirt in an apparent attempt to restrain her and that she pushed and pulled "with everything [she] had" and was able to break free as her shirt ripped in the defendant's hand. The jury was entitled to believe the testimony of the victim regarding those events. It is "the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Roy*, supra, 38 Conn. App. 489. "If evidence . . . should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." (Internal quotation marks omitted.) Id., 488.

Our review of the evidence in the light most favorable to sustaining the verdict satisfies us that, from the evidence introduced and the reasonable inferences to be drawn therefrom, the jury reasonably could have concluded as it did.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.