STATE OF CONNECTICUT *v.* KATHY GREENE
(AC 20348)

Schaller, Mihalakos and Dranginis, Js.

Argued January 18—officially released April 30, 2002

*Auden Grogins,* special public defender, for the appellant (defendant).

*Eileen F. McCarthy,* assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Anne Mahoney,* assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Kathy Greene, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3), assault in the first degree in violation of General Statutes § 53a-59 (a) (3) and risk of injury to a child in violation of General Statutes § 53-21.[1] The defendant's sole claim on appeal is that a new trial should be ordered because the trial court improperly admitted prejudicial and irrelevant evidence of the defendant's prior misconduct against the victim. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, Raegan McBride, was born on January 14, 1995. In December, 1996, the victim was enrolled by her parents into a licensed day care facility, which the defendant operated out of her home in Windsor. The defendant told the victim's mother, Patrice McBride, that she was a licensed medical technical aide and licensed to administer medication and to perform cardiopulmonary resuscitation. By agreement and after an initial part-time trial period, the victim was placed in the defendant's care Monday through Friday, from 7:15 a.m. to 5:30 p.m. The defendant also agreed to

---

[1] In its November 18, 1999 judgment, the court vacated the defendant's sentence for assault in the first degree and merged that conviction with her conviction for manslaughter in the first degree. As a result, the defendant was sentenced to consecutive terms of twenty years for manslaughter in the first degree and ten years for risk of injury to a child for a total effective sentence of thirty years of incarceration.

discipline the victim by using only what is commonly known as "time outs," or periods of the child having to sit quietly alone.

On February 17, 1997, the victim was treated for an ear infection by her pediatrician, who agreed that she could still be placed in day care. On February 24, 1997, the victim's grandmother, Patricia Ward, took the still-ailing victim to the defendant's home around 7:15 a.m. As Ward prepared to leave, the victim cried and grabbed Ward's leg. One of the defendant's foster children told Ward that the victim always cried when she was left with the defendant but that she would calm down soon. The defendant then approached the victim and told her to stop crying or she would become angry. After reassuring the victim, Ward departed.

Just before 3 p.m. that afternoon, the defendant called McBride at work to report that the victim was coughing up mucus and blood and making a strange breathing noise. The defendant also asked whether the victim was ever diagnosed as having a seizure and insisted that McBride pick her up immediately. McBride told the defendant that Ward would pick up the victim. McBride then called Ward, who agreed to do so. Subsequently, McBride left work and drove to the defendant's home where she saw Ward's car and an ambulance parked outside.

The defendant had placed a call for emergency assistance at approximately 3:05 p.m. Responding to that call, police officers and paramedics arrived and began administering first aid to the victim, whose condition had deteriorated into cardiac arrest. Contemporaneously, Ward told a police officer that the victim had an earache and was taking penicillin recently as treatment. The victim and Ward were then transported by ambulance to the Connecticut Children's Medical Center at

Hartford Hospital. The defendant, having offered to do so, drove McBride to the hospital.

After receiving further medical attention at the hospital, the victim was pronounced dead at 4:12 p.m. Near the time of her death, the victim's treating physician, James Wiley, noted that she had suffered retinal hemorrhages in both eyes. This observation was consistent with a diagnosis of "shaken baby" or "shaken impact" syndrome.[2] While at the hospital, McBride informed the defendant of the victim's death and asked her what had happened. The defendant did not reply. Ward also confronted the defendant, who threw her hands up and said, "There's no bruises on her." Ward then asked a physician to perform a full autopsy on the victim.

On February 25, 1997, Edward McDonough, deputy chief state medical examiner, performed an autopsy on the victim. The autopsy of the victim disclosed no evidence of external injury, but revealed bleeding under the victim's scalp and in the tissue between her scalp and her skull, as well as bleeding around and tears in her brain. The autopsy also disclosed multiple skull fractures and that the victim's injuries occurred within about four to six hours of her death. Further, the victim's death was certified as a homicide and her ear infection was not related to her cause of death. These observations also were consistent with a diagnosis that "shaken impact" syndrome involving blunt force trauma

[2] Wiley testified at trial that "shaken baby" syndrome typically occurs when a child, usually three years old or younger, is shaken with sustained, vigorous force. This shaking leads to hemorrhaging in the blood vessels of the eyes and skull. The shaking necessary for such a result would be more than that sustained in a normal fall off of a bed or even from an adult's standing height. Wiley further explained that this shaking is followed typically by a major impact causing blunt trauma to the head, including severe injuries to the brain and skull. Wiley stated that such an impact could result from throwing a child against a flat surface. Finally, Wiley testified that a child subjected to this type of mistreatment could suddenly lose consciousness, fall into a coma and, frequently, would remain comatose or die.

to the victim's head was the cause of the victim's death. Subsequent examinations of the victim's eyes, brain and skull revealed findings similar in kind and degree to those derived from the autopsy. Additional facts and procedural history will be provided as necessary.

The defendant asserts on appeal that the court improperly admitted prejudicial and irrelevant evidence of her prior misconduct against the victim. More specifically, the defendant argues that the court abused its discretion in allowing the testimony of two child witnesses, who related accounts of the misconduct. We disagree.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held that such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . .

"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . .

[T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . The problem is . . . one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 396–97, 788 A.2d 1221 (2002).

The record reflects the following additional facts and procedural history. Prior to the testimony of the child witnesses, the court heard argument as to whether their testimony was admissible. The state argued that the testimony was necessary to establish an element of the crimes charged, to show that the crimes were not accidental and to explain the defendant's motive. Defense counsel objected and argued that evidence of uncharged misconduct could not be admitted to prove the defendant's guilt of the crime charged, to show bad character or to demonstrate a propensity to commit the charged crime. Defense counsel further argued that the testimony could not be used to demonstrate the defendant's identity because the misconduct involved was not sufficiently unique or identical in method so as to be called a signature offense. Finally, defense counsel asserted that the testimony was more prejudicial than probative because of the strength of the state's case, the plethora of other evidence available to the state, the degree to which it could rouse the jurors' emotions and its inability to demonstrate a system of criminal activity by the defendant. The court ruled that it would admit testimony regarding misconduct against the victim because it showed the defendant's specific animus toward the victim and lent itself toward ques-

tions concerning the defendant's motive, opportunity and state of mind.[3]

The first child witness testified that she, her brother and other children were in the defendant's care after school hours in February, 1997. She further testified that the defendant treated the victim poorly, would "almost force feed" the victim and would spank the victim if she did not eat. The second child witness, the first witness' brother, did not identify the defendant from the witness stand, but confirmed that he was also in the defendant's care after school. He further testified that, if the victim would not eat, the defendant would "shove the food in her mouth and slap her." He also stated that the victim would then cry and the defendant would tell her to "shut up." After the testimony of the two child witnesses ended, the court instructed the jury that evidence of prior misconduct could be used only to establish intent, motive or identity and not to establish the defendant's bad character, a predisposition on the part of the defendant to commit any of the crimes with which she was charged or to demonstrate a criminal propensity.

As an initial matter, the defendant's argument that the state improperly introduced, and the court improperly admitted, the testimony to prove the defendant's identity through signature offenses is misplaced. Our law allows many exceptions to the rule against prior misconduct evidence, including circumstances where such evidence is offered to prove identity, malice, motive or

---

[3] The court also noted, as an aside, that this case involved a "kind of strange identity issue," but that the testimony was admissible because it was more probative than prejudicial in that it involved specific acts against the victim. The court specifically precluded testimony from the child witnesses concerning some twenty or more other acts of misconduct committed against other children. The court reasoned that limiting the testimony in this way would prevent a prejudicial "piling on" of other misconduct evidence against the defendant.

the elements of a crime. See id. Testimony aligned with any one of these exceptions may provide the catalyst necessary to admit prior misconduct evidence so long as it is relevant and material to the subject of the exception and is more probative than prejudicial. Id., 397.

The record is clear that the state offered the testimony to establish an element of the crime charged, the defendant's malice toward the victim and her motive. The state mentioned identity only as one of the exceptions to the rule against admitting prior misconduct evidence and not as part of its argument for admitting the evidence at issue. Further, the court admitted the evidence chiefly on the ground that it was quite probative of malice and motive because it showed specific instances of the defendant's misconduct toward the victim. Therefore, the defendant's argument as it relates to the identity exception has no real bearing on this case.

The defendant also contends that the evidence of her prior misconduct toward the victim was not nearly so severe as the misconduct involved in the crime charged. As a result, the defendant argues that the prior misconduct evidence was unable to demonstrate motive on her part. Further, the defendant asserts that the prior misconduct evidence was irrelevant and highly prejudicial because it did not prove a history of serious violence between the defendant and the victim.

"[E]vidence is relevant only when it tends to establish the existence of a material fact . . . ." (Internal quotation marks omitted.) *State* v. *Downing*, 68 Conn. App. 388, 394, 791 A.2d 649 (2002). Such evidence is admissible even when it is not conclusive or is relevant to only a slight degree, provided that it is not prejudicial or simply cumulative. See *State* v. *Cuesta*, 68 Conn. App. 470, 476, 791 A.2d 686, cert. denied, 260 Conn. 914, 796 A.2d 559 (2002). Prejudicial evidence is evidence that "tends to have some adverse effect upon a defendant

beyond tending to prove the fact or issue that justified its admission into evidence." (Internal quotation marks omitted.) *State* v. *Feliciano,* 256 Conn. 429, 454, 778 A.2d 812 (2001). Yet, a balance must be struck between what evidence is prejudicial and how probative that evidence is despite its ability to whip up emotions. See *State* v. *Vega,* supra, 259 Conn. 396–97.

We recognize that prior misconduct evidence cannot be used merely to show an evil disposition or criminal propensity. See *State* v. *O'Neill,* 200 Conn. 268, 273, 511 A.2d 321 (1986). We conclude, however, that here the court reasonably ruled that the evidence of specific acts of prior misconduct against the victim was admissible. First, we conclude that the prior misconduct evidence, while certainly damaging to the defendant, was relevant and material because the defendant's spanking, slapping, and force-feeding of the victim tends to establish the material fact of the defendant's malice toward the victim and lends itself to discerning the motive behind her later actions. In arriving at our conclusion, we note that our Supreme Court has held that "[t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will *improperly* arouse the emotions of the jury." (Emphasis added; internal quotation marks omitted.) *State* v. *Pappas,* 256 Conn. 854, 888, 776 A.2d 1091 (2001). While the prior misconduct evidence was sure to stir some emotions, it just as clearly was relevant to demonstrate the defendant's malice toward the victim, her motive, and an element of the crimes charged.

Our review of the record also demonstrates that the court carefully balanced the issues involved and properly determined that the probative value of the prior misconduct evidence outweighed its prejudicial effect. Further, to avoid unduly prejudicing the defendant or admitting cumulative evidence, the court admitted only specific acts of misconduct against the victim while

carefully excluding evidence of misconduct against other children that would serve only the purpose of rousing the jury's passions. Hence, it was not an abuse of discretion for the court, in balancing these factors, to determine that the evidence was highly relevant to illustrate the exceptions for which it was offered and that its probative value outweighed its prejudicial effect. This is especially true in light of the defendant's agreement to discipline the victim with "time outs" only.

Nevertheless, even if the court abused its discretion by allowing the testimony, the error was harmless given the state's strong medical evidence against the defendant, which included gruesome details of the victim's injuries, the time frame in which those injuries occurred and the cause of her death. The argument that the challenged testimony unduly aroused the emotions of the jurors is specious when held up against the certain effect of these unchallenged medical facts. Bearing all this in mind, we conclude that the court's well reasoned ruling was not an abuse of its discretion and did not manifest an injustice on the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.