STATE OF CONNECTICUT *v.*
JULIO CENTENO COLON
(AC 20885)

Mihalakos, Dranginis and Dupont, Js.

Argued April 2—officially released July 23, 2002

*Kent Drager*, senior assistant public defender, with whom were *Eleanordawn Floyd*, certified legal intern, and, on the brief, *Michelle Killion*, certified legal intern, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Matthew C. Couloute, Jr.*, former assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Julio Centeno Colon, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (3) and assault in the second degree in violation of General Statutes § 53a-60 (a) (3).[1] On appeal, the defendant claims that the trial court improperly (1) rendered the judgment of conviction of assault in the first degree on the basis of insufficient evidence,[2] (2) admitted hearsay testimony and excluded

[1] The defendant was charged with three counts: (1) attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a); (2) assault in the first degree in violation of § 53a-59 (a) (1), also known as intentional assault; and (3) assault in the first degree in violation of § 53a-59 (a) (3), also known as reckless or extreme indifference assault. The defendant was acquitted of the first count. On the second count, the defendant was convicted of the lesser included offense of assault in the second degree in violation of § 53a-60 (a) (3). The defendant was convicted of the third count. At sentencing, the court merged the conviction of assault in the second degree with the conviction of assault in the first degree. The defendant was then sentenced to twenty years of incarceration, execution suspended after fifteen years with five years of probation.

[2] The defendant does not claim that his conviction of assault in the second degree in violation of § 53a-60 (a) (3) was based on insufficient evidence. Section 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (3) he recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument . . . ."

expert testimony in rebuttal to the hearsay, (3) admitted evidence of his prior uncharged misconduct and (4) instructed the jury on what constitutes proof beyond a reasonable doubt. We affirm the judgment of the trial court.

The jury reasonably could have found the following relevant facts. In July, 1999, the victim, Daniela Morales,[3] had been in an intimate relationship with the defendant for three months. At the time, the defendant had lived with the victim and her four children for less than a month in an apartment on Pembroke Street in Bridgeport. Both Spanish and English were spoken in their home, but the defendant rarely spoke in English because of his unfamiliarity with the language.

On July 4, 1999, the victim and her sister, Velma Rivera, went to their niece's birthday party at the home of their older sister, Diana Gonzalez, about two blocks away from the victim's apartment. Upon arrival, the victim noticed that the defendant was already in attendance and was drinking outside the home with his friends and his brother-in-law. Soon thereafter, the defendant, who apparently became angry after a short discussion with the victim and Gonzalez, left the party in his car and then returned. Around 5 p.m., the defendant produced a short barreled shotgun and shot it two or three times into the air. Rivera told the defendant to stop shooting because her two year old son was standing nearby. The defendant, stating that he did not care, departed from the party in his car. The victim, however, remained behind.

Around 11:30 p.m., the defendant returned to the party. He then grabbed the victim, threatened her and demanded that she come home with him. The victim refused to leave. The defendant left, but then returned

---

[3] The record and trial transcripts alternately refer to the victim as Danielle Morales and Daniela Morales.

shortly thereafter, and grabbed and threatened the victim again and demanded that she leave with him. The defendant told the victim that he was not playing with her and that she knew what would happen if she refused to leave. The victim refused again and told the defendant that she would be getting a ride home from Rivera. The defendant, although visibly angry, left the party again. Within two hours, the victim decided to leave the party. Rivera then drove the victim and her children home, leaving them outside her unlit apartment. Entering the apartment, the victim turned on the lights and three of her children went straight to their bedroom. The victim's youngest daughter lagged behind her mother. The victim then entered her bedroom, turned on the light and saw the defendant lying on their bed, apparently asleep, with his hand under a pillow.

Instantaneously, the defendant rose from the bed and put the barrel of a shotgun, which had been hidden under the pillow, to the victim's head. The victim's daughter, after observing this, ran to her bedroom. The defendant swore at the victim and told her that she would regret always wanting to be around her family. The victim tried to block the shotgun with her hands and to push it away from her face to avoid being shot in the head. In doing so, she did not attempt to grab the shotgun or pull it away from the defendant. Additionally, the victim did not pull the trigger on the gun, gain possession of it or shoot herself by mistake. Indeed, the victim had never had physical contact with the shotgun before this incident.

Notwithstanding the victim's attempts to avoid harm, the defendant hit the victim in the forehead with the barrel of the shotgun three times. During this attack, the defendant's weapon discharged once. The victim's next memory was of waking up while her youngest daughter was trying to revive her. Disoriented at first, the victim discovered that she had been shot in the

face and arm and was bleeding profusely from shotgun pellets embedded therein, and that her left hand was broken. The victim then begged the defendant to take her to the hospital.

The defendant gave the victim a towel to stem her bleeding and transported her and her children to a Bridgeport hospital in his car. On the way to the hospital, the defendant repeatedly swore at the victim in Spanish and apologized to her. Upon arrival, the defendant helped the victim out of the car and told a guard that he had found her in her injured condition. The defendant left the hospital and took the children to Gonzalez' home. When the defendant and the children arrived at Gonzalez' home, the victim's son ran into the backyard and told Rivera that the defendant shot the victim. Rivera, Gonzalez and the victim's mother then confronted the defendant about what had happened to the victim. The defendant, who appeared "a little drunk," claimed that the victim had shot herself while playing with a gun. After the confrontation, the defendant left Gonzalez' home in his car.

Meanwhile, David Lin, an emergency room physician, assessed the victim's injuries. The victim told Lin that she had been shot and hit in the head with a blunt object.[4] Lin determined that the shooting had caused severe lacerations on the victim's left forearm and face, exposure and, in some areas, complete eradication of certain muscle, tendon and nerve tissue in her left forearm, considerable swelling of her face and bleeding around and inside her eye. Lin considered the victim's injuries to be serious and life threatening because of the blood loss from the arm injury and also the possibility,

---

[4] At the Bridgeport hospital, the victim also told Sergeant Lynn Holly, a Bridgeport police officer, that she was not holding the gun when it went off and that the defendant had shot her. On the morning of July 5, 1999, two Bridgeport police detectives also interviewed the victim, who again identified the defendant as the person who had shot her.

which was later ruled out, that a shotgun pellet may have entered her brain.

The victim was transferred to Yale-New Haven Hospital, where she received blood transfusions and underwent three operations to try to restore the use of her left hand, in which a plate was implanted and on which a skin graft was performed. As a result of the shooting, the victim suffered total blindness in her left eye, near total loss of the use of her left arm, scars on her left forearm and contractures, or curling, of the fingers on her left hand. Further, she has endured a process, over a nine month period, in which the shotgun pellets in her face worked themselves out of her body naturally.

On July 5, 1999, the defendant's car was found behind a house on Noble Avenue in Bridgeport. That afternoon, Officer Jose Luna of the Bridgeport police department located the defendant. Luna asked the defendant for his name and whether he could speak with him. Without any further questioning, the defendant stated that he was the one Luna sought. Luna found no weapon in the defendant's possession.[5] Luna then brought the defendant to nearby police detectives and soon thereafter the defendant was arrested. Additional facts and procedural history will be provided as necessary.

I

The defendant first claims that there was insufficient evidence to support his conviction of assault in the first degree under § 53a-59 (a) (3).[6] Specifically, he contends that the evidence adduced at trial did not prove beyond

---

[5] Although the defendant claimed that he left his shotgun at the apartment he shared with the victim, the police never recovered a weapon in relation to these events.

[6] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

a reasonable doubt a necessary element of the crime, namely, that his actions occurred "under circumstances evincing an extreme indifference to human life." In his brief, the defendant concedes that he acted recklessly and that his recklessness caused the victim's serious physical injuries.[7] The defendant argues, however, that because he was not convicted of attempt to commit murder or intentional assault,[8] the jury implicitly and necessarily found that he unintentionally shot the victim through mere recklessness and not under circumstances evincing an extreme indifference to human life.[9] We do not agree.

We begin our analysis by stating our well established standard of review for sufficiency of the evidence claims. "[W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . Moreover, [e]vidence is not insufficient . . . because it is conflicting or inconsistent. [The jury] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the

---

[7] The defendant does not argue that the element in § 53a-59 (a) (3) of "conduct which creates a risk of death to another person" was not supported by sufficient evidence to prove the element beyond a reasonable doubt.

[8] See footnote 1.

[9] In support of this argument, the defendant points out that the crime of assault in the second degree does not contain extreme indifference to human life as an element. Further, the defendant asserts that an analysis of case law interpreting the element shows that the defendant did not act under circumstances evincing an extreme indifference to human life because his acts did not threaten more than one person and, despite his actions leading up to and including the shooting, he was the one who took the victim to the hospital.

[jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [jury] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject." (Citation omitted; internal quotation marks omitted.) *State* v. *Senquiz*, 68 Conn. App. 571, 575–76, 793 A.2d 1095, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).

In our statement of facts concerning what the jury reasonably could have found, we already have construed the evidence in the light most favorable to upholding the verdict. We must now determine whether, upon these facts and the inferences reasonably drawn therefrom, the jury reasonably could have found that the evidence established beyond a reasonable doubt that the defendant acted with extreme indifference to human life. To accomplish this, we must first examine the element in question.

Our Penal Code does not define, in title 53a of the General Statutes, what constitutes "extreme indifference to human life." See *State* v. *Best*, 56 Conn. App. 742, 755, 745 A.2d 223, cert. denied, 253 Conn. 902, 753 A.2d 937 (2000). Therefore, "it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *State* v. *Payne*, 240 Conn. 766, 771, 695 A.2d 525 (1997). This court has done so in the past. Examining the term as it is used in title 53a of the General Statutes, we have stated that the legislature modified the level of "indifference" required with the adjective "extreme," which "has been defined to mean existing in the highest or greatest possible degree. . . . It is synonymous with excessive. . . . What evinces an extreme indifference to human life is really a question of fact." (Internal quotation marks omitted.) *State* v. *Hallowell*, 61 Conn. App. 463, 468, 766 A.2d 950 (2001); see also *State* v. *Best*, supra, 755.

We also recognize that the element in question involves the general intent of the defendant in that he must be shown to have had the general intent to engage in conduct evincing an extreme indifference to human life. See *State* v. *Best*, supra, 56 Conn. App. 754 (element of "evincing an extreme indifference to human life" goes to show defendant's general intent). The defendant's state of mind or general intent in the present case at the time of the assault may be proven from his conduct "before, during and after the attack. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." Id., 756.

The facts reasonably found from the evidence were sufficient to prove beyond a reasonable doubt that the defendant acted under circumstances evincing an extreme indifference to human life. On the day of the shooting, the defendant first demonstrated a disregard for human life when he stated that he did not care that he was shooting a gun into the air with children nearby. Later that day, the defendant grabbed and threatened the victim multiple times. He then lay in wait for the victim to come home, pretending to be asleep. He immediately attacked her when she arrived by hitting her three times in the head with the barrel of his loaded shotgun. He told her that she would regret wanting to spend so much time with her family. During this attack, the defendant's weapon discharged and caused life threatening injuries to the victim. Also, the defendant's attack took place, in part, in the presence of one of the victim's children, which clearly placed the child in potentially deadly danger. We also note that, as discussed in part III of this opinion, the jury was aware of and could properly draw inferences as to the defendant's state of mind or attitude toward the victim from the evidence that he had threatened the victim with a

gun in the past by placing it in her mouth and had threatened her verbally at times.

The defendant's behavior was such that the jury reasonably could have inferred from it that he evinced an extreme indifference to human life. Moreover, we disagree with the defendant's arguments to the contrary. See footnote 9. First, § 53a-59 (a) (3) clearly does not require that multiple persons be harmed or threatened with harm in order to establish the element of extreme indifference to human life. See generally *State* v. *Best*, supra, 56 Conn. App. 757–59 (extreme indifference to human life element met on facts involving only one potential and actual victim).[10] Second, the jury was able to consider all of the evidence and circumstances surrounding the shooting and determine whether the defendant's actions after the shooting showed sufficient concern for the victim's life to mitigate a finding of extreme indifference to human life. We conclude that the jury reasonably could have found that the evidence established beyond a reasonable doubt that the defendant, under circumstances evincing an extreme indifference to human life, engaged in reckless conduct that created a risk of death to the victim and caused serious physical injury to her.

## II

The defendant next claims that the court improperly admitted hearsay testimony during the state's redirect examination of Sergeant Lynn Holly, an officer with the Bridgeport police department, concerning statements made by the defendant to the victim's mother, Sara Perez. In connection with this claim, the defendant also

[10] The defendant in *State* v. *Best*, supra, 56 Conn. App. 751–59, challenged whether there was sufficient evidence to meet the element of extreme indifference to human life for the crime of manslaughter in the first degree under General Statutes § 53a-55 (a) (3). For purposes of our analysis, there is no difference between the meaning of that element under §§ 53a-55 (a) (3) and 53a-59 (a) (3).

claims that the court improperly refused to allow his expert witness to testify in rebuttal to Holly's testimony.[11] We are not persuaded.

The record reflects the following additional relevant facts and procedural history. During its case-in-chief, the state called Holly to testify regarding her involvement in this case. During cross-examination, defense counsel asked Holly to refresh her memory of her investigation from the police report that she had filed, which memorialized an interview that she had conducted with Perez following the shooting. Having refreshed the witness' memory, defense counsel then asked Holly to recount part of her interview with Perez. Although the state objected on the ground of hearsay, the court allowed the testimony.[12] On redirect examination, the

---

[11] The defendant also claims that a new trial is required because the court, through these evidentiary rulings, deprived him of his constitutional rights to confront witnesses and to present a defense. Although the defendant objected to the rulings here, his objections were overruled. The defendant also requests *Golding* review for his constitutional claims in the event that we find them unpreserved. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Whether or not these claims were preserved, we need not address either of the defendant's alleged constitutional violations because the rulings at issue here are not constitutional in nature. See *State* v. *Cavell*, 235 Conn. 711, 721, 670 A.2d 261 (1996) (exclusion of testimony of expert witness nonconstitutional); *State* v. *Lomax*, 60 Conn. App. 602, 610, 760 A.2d 957 (admission of impermissible hearsay not constitutional error), cert. denied, 255 Conn. 920, 763 A.2d 1042 (2000). We will review these claims, therefore, only as evidentiary claims, for which the defendant has the burden of proving that the court's ruling more probably than not affected the result of the trial. See *State* v. *Cavell*, supra, 721–22.

[12] The trial transcript reveals in relevant part the following:

"[Defense Counsel]: Okay. You did make a report in connection with your investigation of this matter, which included speaking with [Perez], correct?

"[Holly]: Yes.

"[Defense Counsel]: And that report . . . was filed with the Bridgeport police department, correct?

"[Holly]: Yes.

"[Defense Counsel]: And everything you put in the report was accurate, obviously, correct?

"[Holly]: Yes.

"[Defense Counsel]: And one of the main reasons to make such a report is to document it while your memory is fresh when you're being told these

state asked Holly to testify further about her interview with Perez. Defense counsel immediately objected to Holly's testimony as hearsay but was overruled by the court. Holly then testified that Perez had told her that, when the defendant dropped the children off at Gonzalez' home, he claimed that the victim accidentally shot herself while cleaning his shotgun. Further, Holly testified that it was clear to her that Perez did not believe the defendant's explanation.[13]

things, correct?

"[Holly]: Yes.

"[Defense Counsel]: So what's in your police report may refresh your recollection at this point since so much time has gone by, right?

"[Holly]: Yes. Okay.

"[Defense Counsel]: Okay. Does that refresh your recollection as to whether you were able to ascertain from your conversation with [Perez] whether the children had been witnesses to this event?

"[Assistant State's Attorney]: Objection. Calls for hearsay, Your Honor.

"The Court: Overruled. Does that refresh your recollection was the question that was asked.

"[Holly]: Yes.

"[Defense Counsel]: Okay. And were you able to ascertain whether the children were in fact witnesses to the event?

"[Holly]: [Perez] . . . told me that the children were in their bedrooms. However, she was not on the scene when [the shooting] happened.

"[Defense Counsel]: Okay. And did she also tell you that they did not know what happened?

"[Holly]: That's what she told me, yes.

"[Defense Counsel]: And isn't it a fact that you note that in your police report?

"[Holly]: Yes.

"[Defense Counsel]: And do you know if . . . Perez had spoken with the children before she spoke with you?

"[Holly]: I believe she had.

"[Defense Counsel]: Were the children at the hospital?

"[Holly]: No. She had told me that [the defendant] had dropped off the children [at] the victim's sister's house.

* * *

"[Defense Counsel]: Okay. So this was the extent of your investigation, having spoken with [Perez] and the family, going to the hospital. Your obligations were over at that point, right?

"[Holly]: Yes."

[13] The trial transcript reveals in relevant part the following:

"[Assistant State's Attorney]: Just a couple questions, sergeant. You were

Defense counsel subsequently called John Lombardi, an interpreter of the Spanish language, who was employed by the state judicial branch, as an expert witness on Spanish and a mixture of English and Spanish known as Spanglish. During her direct examination, defense counsel asked Lombardi, "Could the word yanking be confused in Spanish with the word cleaning?" The state objected on grounds of relevance and because the witness had not been established as an expert. Defense counsel argued that Lombardi's testimony was necessary to dispel an ambiguity in what Perez had told Holly concerning the defendant's explanation for the shooting. In essence, defense counsel argued that Perez had potentially misunderstood the defendant's explanation because, as Lombardi's testimony would purportedly show, in Spanish it is easy to confuse the word for "yanking" or "pulling" with the word for "cleaning." In other words, defense counsel wanted to rebut Holly's testimony with Lombardi's testimony that the defendant's explanation could have been that the victim was yanking or pulling on the gun when it discharged.

The state objected to the use of the expert witness. The state asserted that the best person to clear up any confusion as to what the defendant's explanation was would be the defendant, who could just as easily rebut Holly's testimony. The state also contended that the proffered expert would be speculating about facts not

---

speaking to [Perez] during your investigation. Were you able to ascertain possibly what happened that night?

"[Holly]: [Perez] had told me that—

"[Defense Counsel]: Objection as to hearsay.

"The Court: I allowed it for you. I'm going to allow it for him. Go ahead.

"[Holly]: Okay. [Perez] had told me that . . . [the defendant] told her that it had occurred because [the victim] was cleaning the weapon.

"[Assistant State's Attorney]: Did she . . . in speaking with her were you able to ascertain whether or not she believed that story?

"[Holly]: She did not believe it at all."

on the record because the defendant had yet to testify as to what constituted his true explanation.[14] After allowing defense counsel to make an offer of proof

[14] The transcript reveals the following colloquy, in relevant part, concerning Lombardi's testimony:

"[Defense Counsel]: If a person were to tell someone in Spanish that someone was yanking a shotgun.

"[Lombardi]: Yes.

"[Defense Counsel]: Could the word yanking be confused in Spanish with the word cleaning?

"[Assistant State's Attorney]: Objection. . . . I'm not sure exactly what relevance this has to anything. The term yanking hasn't been introduced in this trial at all. A hypothetical given to this man, I don't understand the purpose of it. It's irrelevant. I don't know that he's competent to answer the question either.

\* \* \*

"[Defense Counsel]: Your Honor, there was testimony from [Holly] indicating that . . . the defendant had related to [Perez] that . . . the alleged victim had been cleaning the shotgun and it went off. I'm just here to clarify any confusion in the Spanish translation of [the] word cleaning versus pulling or yanking.

"[Assistant State's Attorney]: Wow. But shouldn't that be cleared up by the person who actually made the statement as to what was on their mind? An interpretation of what they were actually saying isn't for this man to determine. It's for the person who made the statement.

"The Court: That's a better objection. I'll sustain the objection on that basis.

\* \* \*

"[Defense Counsel]: [The grandmother related what the defendant said] to the police officer who related it to us here in court. And that makes my client look like he's fabricating some story . . . . He never said that. And we have an explanation to rebut that. There is confusion in the Spanish language. There is a very similar word between cleaning and yanking or pulling. My client will testify that there is yanking and pulling . . . . Also, there is testimony that there was a tug-of-war from the police officer who took the statement. So, there's ample evidence to support the hypothetical and there is absolutely prejudicial inference against my client that he fabricated some story of how it went off, that she was cleaning it, which is absurd. And if a jury were to run on that inference to build up another inference, it could prejudice my client if I don't clear this up. And this interpreter with his expertise can tell this court that there could easily be confusion between the word cleaning and yanking or pulling. So what we are saying is my client is going to testify that he told [Perez] that [the victim] was pulling or yanking the gun and that's how it went off. [Perez] took that word that he said in Spanish and misconstrued it as cleaning, which makes my client look like a liar fabricating some preposterous story. . . . It's just

outside of the jury's presence as to Lombardi's potential testimony,[15] the court sustained the state's objection. The defendant made no argument that the testimony would affect his constitutional right not to testify. The court reasoned that to allow Lombardi to testify as to what Perez could have interpreted from what the defendant told her would be to ask Lombardi "to convey

---

to rebut the inference that they have created. Now I'm just trying to rebut their evidence. I think I'm entitled to do that.

"[Assistant State's Attorney]: . . . [T]hat gentleman would have to speculate as to the conversation between [Perez] and [Holly] to actually testify as to what was said or the definition and meaning in which they were using. Secondly, it assumes facts that aren't on record. She's saying what [the defendant is] going to testify to when he gets there. The basis of . . . [Lombardi's] testimony will be assuming what [the defendant is] going to say. There's nothing in the record that indicates what this individual is going to say once he takes the stand. While it may be relevant for this conversation after he takes the stand, prior to him taking the stand and knowing what he meant by that, it's absolutely irrelevant and is only speculative."

[15] The transcript reveals the following relevant colloquy with respect to defense counsel's offer of proof:

"The Court: Let me hear what you're going to ask. Why don't you make your offer of proof by making your inquiry now.

"[Defense Counsel]: Okay.

"The Court: So in the absence of the jury.

\* \* \*

"[Defense Counsel]: My question is assuming the hypothetical . . . if a person were to tell someone in Spanish that someone was yanking or pulling a shotgun, could the word yanking or pulling be mistaken for [a] similar word in Spanish of cleaning. And he will answer that question. That's all I have to ask.

"The Court: What's your answer to that?

"[Lombardi]: Well, as it turns out as regards firearms, if someone were cleaning a firearm they would use either limpiad in Spanish or another term which is puleando . . . . And it turns out that . . . sometimes Spanish is influenced by English . . . . So a lot of words become Anglicized. . . . [W]hat we end up with is Spanglish many times and it turns out—

"The Court: Spanglish, is that what you said?

"[Lombardi]: Spanglish.

"The Court: Spanglish, yes. Go ahead.

"[Lombardi]: And as it turns out there is a verb that a Hispanic may use for pulling which isn't the standard . . . but puliad which is from pulling, from English pull. They have created a word pull and they turn it into Spanish and it becomes puliendo, which sounds like puleando."

to the jury what might have happened in the mind of a witness who hasn't even taken the [witness] stand here. That . . . is about as speculative as you could possibly be." Further, the court reasoned that the defendant's testimony would be sufficient to rebut Holly's testimony. Finally, the court stated that to allow Lombardi's testimony "would cause greater confusion and it wouldn't be of assistance to the trier of fact."[16]

Our standard of review concerning the admissibility of evidence is clear. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 392, 788 A.2d 1221 (2002). This standard applies to the admissibility of both hearsay testimony; see *State* v. *Lomax*, 60 Conn. App. 602, 607–608, 760 A.2d 957, cert. denied, 255 Conn. 920, 763 A.2d 1042 (2000); and expert testimony. See *State* v. *Wargo*, 255 Conn. 113, 123, 763 A.2d 1 (2000). Within this framework, we examine each claim separately.

A

With respect to Holly's testimony, the state impliedly concedes in its brief, and we agree, that the challenged

---

[16] We note as well that, after the defendant testified as to what he had told Perez, defense counsel attempted to recall Lombardi as an expert witness. The court noted that the defendant testified as to what his explanation meant and that defense counsel could have called Perez to "clarify any misunderstanding" but did not do so. Subsequently, the court again ruled that it would not allow "an interpreter [Lombardi] on the [witness] stand to tell the trier of fact what a third party [Perez] may have misunderstood when that third party hasn't been on the stand."

evidence constituted hearsay. The state argues, however, that the defendant opened the door by eliciting a prior hearsay response during its cross-examination of Holly. The state contends, therefore, that it was entitled to present the rest of Holly's conversation with Perez to prevent the defendant from selectively using only a part of the conversation for his own advantage. The defendant recognizes the basis for the state's argument in its brief but argues that the doctrine on opening the door is not a recognized hearsay exception. We agree with the state.

We have long recognized that generally "[a] party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party." (Internal quotation marks omitted.) *State* v. *Dwyer*, 59 Conn. App. 207, 214, 757 A.2d 597, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000). "Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence." (Internal quotation marks omitted.) *State* v. *Paulino*, 223 Conn. 461, 467, 613 A.2d 720 (1992). In other words, "[t]his rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context." (Internal quotation marks omitted.) Id.

In this case, defense counsel delved into the conversation that Holly had with Perez and attempted to use, to his advantage, only part of that conversation. See footnote 12. Defense counsel extracted from that conversation only the part dealing with whether the victim's

children actually witnessed the shooting.[17] At oral argument, the defendant argued that the subject of inquiry, and thus any potential rebuttal by the state, was limited to the issue of what the children witnessed. This belies the fact, however, that defense counsel began her inquiry into the conversation by asking whether Holly accurately memorialized the *entire* interview with Perez.

We conclude that the defendant opened the door to the full substance of Holly's conversation with Perez. The court was within its discretion to allow further inquiry into the substance of the conversation. "In determining whether it should allow further inquiry into the subject matter, the court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal in the form of redirect." *State* v. *Meikle,* 60 Conn. App. 802, 815–16, 761 A.2d 247 (2000), cert. denied, 255 Conn. 947, 769 A.2d 63 (2001). Considering the totality of the circumstances, and making every reasonable presumption in favor of the court's ruling, the court reasonably could have concluded that allowing further inquiry by the state was necessary to place Holly's previous testimony about the conversation in its proper context. We conclude, therefore, that the court's ruling was not a manifest abuse of discretion and the evidence was properly admitted.

## B

The defendant's contention that the court improperly excluded expert testimony is also misplaced. "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to

---

[17] The day before Holly testified, the victim's daughter had testified that she witnessed part of the attack on the victim. Defense counsel apparently wanted to use Holly's testimony to undercut the child's testimony in an effort to bolster the defendant's stance that the shooting was an accident.

a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Wargo,* supra, 255 Conn. 123. To be admissible, expert testimony must be relevant to some issue in the case. See id. Nevertheless, "[a]n expert opinion cannot be based on conjecture or surmise but must be reasonably probable." (Internal quotation marks omitted.) *Aspiazu* v. *Orgera,* 205 Conn. 623, 632, 535 A.2d 338 (1987).

In this case, although he had the opportunity, the defendant did not present the exact language used, whether in English, Spanish or Spanglish, in his explanation of the shooting to Perez. The defendant also chose not to call Perez to present the language used. Lombardi's testimony about any linguistic confusion that might have occurred between Perez and the defendant would have been entirely speculative because it would not have been based on facts in evidence. Further, the court's reasoning that the jury could be confused by the added layer of complexity associated with a linguistic analysis of the defendant's explanation was not unreasonable. Making every reasonable presumption in favor of upholding the court's ruling, we conclude that excluding the expert testimony at issue was not a manifest abuse of the court's discretion.

C

Even if we assumed that the court improperly admitted the hearsay evidence and excluded the expert testimony, the defendant's claims are unavailing. "The standard for determining whether a nonconstitutional error is harmless is that [t]he defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Cavell,* 235 Conn. 711, 721–22, 670 A.2d 261 (1996). Contrary to the defendant's claims,

he was not prevented from confronting witnesses or putting on the defense that Perez misunderstood his explanation about the shooting.

As we have stated, the defendant opened the door to the admission of Holly's hearsay testimony and cannot now declare it an abuse of discretion. Even if the defendant could do so, however, he would not prevail. The defendant had the opportunity to call Perez to the witness stand to testify directly as to what she understood his explanation to be, but he declined to do so. More importantly, the defendant testified in rebuttal to the hearsay testimony that he told Perez that the victim "had been pulling the firearm [and] it had shot off and I had . . . to take her to the hospital." This testimony directly contradicted the hearsay testimony and effectively presented the defendant's side of the case. Thus, the defendant has failed to prove that the hearsay testimony more probably than not adversely affected the result of his trial.

Moreover, the defendant's testimony also constituted the heart of what Lombardi would have stated in his testimony, i.e., that the defendant's explanation of the shooting was possibly that the victim accidentally shot herself. Since the substance of the defendant's testimony was the same as what Lombardi would have established,[18] we conclude that the defendant has failed to demonstrate that it is more probable than not that the exclusion of Lombardi's testimony affected the result. See id., 721–23. (exclusion of expert witness deemed harmless where substance of expert's testimony presented by another witness). Thus, the jury was not prevented, as the defendant argues, from considering the defendant's explanation of events, including his defense that Perez misunderstood the explanation. Accordingly, we conclude that the inclu-

---

[18] See footnote 15.

sion of Holly's hearsay testimony and exclusion of Lombardi's testimony, even if erroneous, were harmless.

### III

The defendant next claims that the court improperly admitted evidence of his prior uncharged misconduct toward the victim. Specifically, the defendant contends that the state should have been barred from using its prior misconduct evidence because the disclosure of its intent to use misconduct evidence was untimely and the evidence did not meet any of the exceptions to the rule barring the use of prior misconduct evidence. We disagree.

The record reflects the following additional relevant facts and procedural history. On February 9, 2000, the defendant filed a motion for notice of uncharged misconduct, which the court granted on February 16, 2000. Over the course of jury selection, defense counsel argued that the state had not complied with the court's order to disclose any prior uncharged misconduct it intended to introduce into evidence. Defense counsel further argued that to allow such evidence at that time would disadvantage the defendant because he had no opportunity to investigate such evidence before trial. On April 3, 2000, the state filed its response to the motion, listing three incidents in which the defendant had threatened the victim.[19] Defense counsel objected to the disclosure and argued that it was untimely.

Later that same day, the issue was addressed again. The state argued that disclosure had been made on September 2, 1999, as to two incidents of prior misconduct and that defense counsel could adequately investigate the third incident, of which the state had only recently become aware, by speaking with the defendant

[19] The three incidents disclosed were that the defendant struck the victim on July 3, 1999, threatened her with a shotgun on an unspecified date and made threats to her just prior to the shooting on July 5, 1999.

before trial. Defense counsel denied being notified of any incidents. Defense counsel further argued that allowing the evidence would prejudice the defendant, amount to unfair surprise and undermine the integrity of the court's order. The court and counsel then acknowledged that attempts had been made previously to accommodate the defendant's disclosure interests by making the victim available at defense counsel's convenience.[20] Defense counsel also acknowledged that the victim was unwilling to speak with her on any topic.

On April 4, 2000, the court ruled that the prior misconduct evidence would be admitted. The court stated that "the alleged acts of prior violence toward the victim closely related in time and [showed] the same modus operandi or . . . common scheme, plan or pattern . . . . They are material in the judgment of the court and probative of intent, malice, criminal design, pattern, opportunity, perhaps identity and means." The court also stated that the order to disclose the prior misconduct was "devoid of any reference to time frames for compliance, and the file itself is devoid of any motion to compel relative to uncharged misconduct." Moreover, the court stated that "to claim surprise given the nature of the offer and the parties involved is contrary to common sense." The court subsequently denied defense counsel's related motions to dismiss and for a continuance.

At trial, the victim testified that about a month before the attack, at a party where the defendant was drinking, she got into an argument with the defendant. The defendant then pulled a gun on her, put it in her mouth and warned her not to "mess with him." The victim testified

---

[20] We note that only the victim and Rivera testified as to prior misconduct at trial. On November 16, 1999, the state disclosed to defense counsel that the victim and Rivera were potential witnesses, and it gave an address for Rivera. The state also provided in that disclosure that arrangements could be made for defense counsel to meet with the victim, if the victim was amenable.

that there were no witnesses to this incident. She also stated that the defendant took the gun out of her mouth and put it away when he heard someone calling him from another room.

The victim also testified that three days before the defendant attacked her, they had another argument. The argument began when the defendant saw her talking with another man outside her sister's home. The defendant approached the victim, grabbed her and smacked her in front of her friends and family. He then questioned her about the content of the conversation with the other man and warned her not to talk with anyone in the streets. Rivera also testified that, while she did not witness the entire incident, she saw the defendant grab the victim and put her in his car.

A

The defendant argues that, pursuant to Practice Book § 40-5,[21] the court should have excluded the prior misconduct evidence proffered by the state as a sanction for the state's untimely compliance. In support of this position, the defendant argues that the state was required to disclose its intent to use prior misconduct evidence by March 20, 2000, ten days before the start

---

[21] Practice Book § 40-5 provides: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it deems appropriate, including, without limitation, one or more of the following:

"(1) Requiring the noncomplying party to comply;

"(2) Granting the moving party additional time or a continuance;

"(3) Relieving the moving party from making a disclosure required by these rules;

"(4) Prohibiting the noncomplying party from introducing specified evidence;

"(5) Declaring a mistrial;

"(6) Dismissing the charges;

"(7) Imposing appropriate sanctions on the counsel or party, or both, responsible for the noncompliance; or

"(8) Entering such other order as it deems proper."

of jury selection in this case. The defendant bases this argument on the fact that the court granted his motion for notice of uncharged misconduct that was filed pursuant to *State* v. *Acquin*, 34 Conn. Sup. 152, 381 A.2d 239 (1977), which requires notice within ten days of trial on a motion for notice of prior crimes and uncharged misconduct. We disagree with the defendant's claim that the court should have excluded the evidence.

Where discovery concerns inculpatory evidence, there exists no constitutional right to the disclosure of such evidence and, therefore, the rules of the court regulate any such disclosure. See *State* v. *Fraenza*, 9 Conn. App. 228, 236–37, 518 A.2d 649 (1986), cert. denied, 202 Conn. 803, 519 A.2d 1207 (1987). In that event, "[t]he trial court has broad discretion in applying sanctions for failure to comply with discovery orders." Id., 237; Practice Book § 40-5. "The purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportunity to prepare for trial. To achieve these goals and to assure compliance with the rules, the trial court must impose an appropriate sanction for failure to comply. In determining what sanction is appropriate, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." (Internal quotation marks omitted.) *State* v. *Corrigan*, 40 Conn. App. 359, 365–66, 680 A.2d 312, cert. denied, 239 Conn. 901, 682 A.2d 1007 (1996). Thus, where substantial prejudice is not suffered by the defendant as a result of the admission of certain evidence, it is not an abuse of the court's discretion to refuse to exclude that evidence as a sanction for noncompliance with a discovery order. See *State* v. *Fraenza*, supra, 237.

Here, counsel agreed that the state made the victim available to the defense. Further, as the court noted, it

is disingenuous for the defendant to claim surprise or prejudice in this case because in domestic violence cases it is not unusual for other incidents of abuse to come to light. Moreover, as the court also stated, the order granting discovery indicates no time frame for compliance and it is not clear, as the defendant contends, that the state agreed to one. More importantly, the defendant was not entitled to the disclosure of inculpatory evidence as a matter of right. It is also beyond question that, within its discretion, the court is empowered to apply whatever sanctions it deems appropriate for the violation of a discovery order, should it find one. Finally, as discussed in part III B of this opinion, the prior misconduct at issue was highly relevant and probative. In light of the court's carefully considered determination of this issue, and the circumstances mentioned previously, we cannot conclude that it improperly exercised its discretion when it refused to exclude the prior misconduct evidence as a sanction for the late compliance with a discovery order.

B

The defendant argues separately that evidence of his prior misconduct was inadmissible because it failed to meet an exception to the rule barring such evidence. We cannot agree.

Prior misconduct evidence cannot be used merely to show an evil disposition or criminal propensity. See *State* v. *Collins*, 68 Conn. App. 828, 841, 793 A.2d 1160, cert. denied, 260 Conn. 941, 835 A.2d 58 (2002). In fact, "[a]s a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held

that such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . .

"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . The problem is . . . one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Internal quotation marks omitted.) *State* v. *Greene*, 69 Conn. App. 463, 467–68, 794 A.2d 1092, cert. denied, 260 Conn. 934, 802 A.2d 89 (2002).

"[E]vidence is relevant only when it tends to establish the existence of a material fact . . . . Such evidence is admissible even when it is not conclusive or is relevant to only a slight degree, provided that it is not prejudicial or simply cumulative. . . . Prejudicial evidence is evidence that tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence. . . . Yet, a balance must be struck between what evidence is prejudicial and how probative that evidence is despite

its ability to whip up emotions." (Citations omitted; internal quotation marks omitted.) Id., 470–71. "The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will *improperly* arouse the emotions of the jury." (Emphasis added; internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 888, 776 A.2d 1091 (2001).

Here, the victim testified that the defendant twice, within a month of the shooting, threatened and physically assaulted her. First, about a month before the shooting, the defendant threatened the victim and put a gun in her mouth. About three days before the shooting, the defendant grabbed, smacked and verbally threatened her because she spoke with another man. Rivera's testimony corroborated this latter incident. The defendant repeated these actions on the day leading up to the shooting with more grabbing, threatening and the use of a gun to abuse the victim, which culminated in the actual shooting.

As this summary makes clear, the evidence of the defendant's prior misconduct is relevant and material to show not only one but all of the exceptions to the rule barring the use of prior misconduct evidence at trial. The evidence here tends to show that the defendant's actions established a pattern of ill will toward the victim that evinced an extreme indifference for human life. We conclude that the evidence offered is relevant and material to show intent, identity, malice, motive, a system of criminal activity *and* the elements of a crime. Further, Rivera's testimony corroborated the victim's crucial testimony. Finally, while the prior misconduct evidence was damaging to the defendant's case, we conclude that it was not unduly prejudicial because it did not improperly arouse the jury's emotions. The exceptions to our rule are intended to allow evidence to come before a jury when on balance it is

more probative than prejudicial. Thus, despite the fact that the evidence here is harmful to the defendant's case, it was properly admitted. Accordingly, we conclude that the court did not abuse its discretion in admitting the prior misconduct evidence.

## IV

The defendant's final claim is that the court improperly instructed the jury on what constitutes proof beyond a reasonable doubt. Specifically, the defendant asserts that seven phrases used by the court in its instruction diluted the state's burden of proof and infringed on the defendant's right to the assistance of counsel.[22] As numerous cases portend, we cannot agree.

As a preliminary matter, the defendant concedes in his brief that our Supreme Court has rejected claims "virtually identical" to his in the past. "We are not at

[22] The transcript reveals the court's phrases that are being challenged by the defendant, emphasized here, in relevant part: "Reasonable doubt, proof beyond a reasonable doubt, what does that mean? Reasonable doubt has no technical or unusual meaning. You can arrive at the real meaning by emphasizing the word reasonable. *Reasonable doubt is a doubt for which you can assign a valid reason.* It's a doubt which is something more than guess or surmise. It's not conjecture or fanciful doubt. A reasonable doubt is not doubt which is raised by someone simply for the sake of raising doubt; nor is it doubt *suggested by the ingenuity of counsel* or any of your fellow jurors which is not justified by the evidence or lack of evidence in the case.

"Reasonable doubt is one that's based on reason and *not on mere possibility of innocence.* It is a doubt *which you can in your own mind conscientiously give a reason for.* Reasonable doubt, in other words, is a *real doubt.* It is *honest doubt,* a doubt which has its foundation in the evidence or lack of evidence in the case. It is the kind of doubt which *in the serious affairs* which concern you in everyday life you would pay heed and attention to. Of course, absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty." (Emphasis added.)

We note that defense counsel took exception in court to many of the phrases challenged here. In the instances in which this is not so, the defendant seeks *Golding* review. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

liberty to overrule or discard the decisions of our Supreme Court but are bound by them." (Internal quotation marks omitted.) *State* v. *James*, 69 Conn. App. 130, 133, 793 A.2d 1200, cert. denied, 260 Conn. 936, 802 A.2d 89 (2002). "It is axiomatic that we are bound by our Supreme Court precedent." (Internal quotation marks omitted.) *Boretti* v. *Panacea Co.*, 67 Conn. App. 223, 231, 786 A.2d 1164 (2001), cert. denied, 259 Conn. 918, 791 A.2d 565 (2002). Thus, it is not within our province to reevaluate or replace those decisions. Our Supreme Court has recently upheld jury instructions containing each phrase challenged by the defendant.[23] Accordingly, the defendant's claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[23] See *State* v. *Whipper*, 258 Conn. 229, 297–98, 780 A.2d 53 (2001) (upholding "serious affairs" and "valid reason" language in reasonable doubt instruction); *State* v. *Montgomery*, 254 Conn. 694, 729–31 & n.41, 759 A.2d 995 (2000) (rejecting constitutional challenge to instruction that reasonable doubt is "real doubt," "honest doubt," or one for which jury could "conscientiously give a reason" and not one based on "mere possibility of innocence" or "suggested by the ingenuity of counsel"). A host of other cases consistently have held similarly.