## STATE OF CONNECTICUT *v.* DOUGLAS SAWYER
### (AC 22382)

Dranginis, Flynn and Healey, Js.

Argued November 21, 2002—officially released February 4, 2003

*David B. Bachman*, for the appellant (defendant).

*David C. Nelson*, certified legal intern, with whom were *Mitchell S. Brody*, senior assistant state's attorney, and, on the brief, *Scott J. Murphy*, state's attorney,

and *Vernon D. Oliver*, assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Douglas Sawyer, appeals from the judgment of conviction, rendered after a jury trial, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70,[1] one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1),[2] two counts of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1),[3] one count of threatening in violation of General Statutes § 53a-62[4] and one count of reckless endangerment in the first degree in violation of General Statutes § 53a-63.[5] On appeal, the defendant claims that

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . which reasonably causes such person to fear physical injury . . . ."

[2] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument . . . ."

[3] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person, or (B) by the threat of use of force against such other person or against a third person, which reasonably causes such other person to fear physical injury to himself or herself or a third person . . . ."

[4] General Statutes § 53a-62 (a) provides: "A person is guilty of threatening when: (1) By physical threat, he intentionally places or attempts to place another person in fear of imminent serious physical injury, or (2) he threatens to commit any crime of violence with the intent to terrorize another, to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or (3) he threatens to commit such crime in reckless disregard of the risk of causing such terror or inconvenience."

[5] General Statutes § 53a-63 (a) provides: "A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person."

the court improperly admitted into evidence acts of uncharged misconduct. We affirm the judgment of the trial court.

The jury could have reasonably found the following facts. On July 15, 1998, the victim, D,[6] lived with her boyfriend, her children and another couple in the town of Plymouth. After D's boyfriend and the other couple left to go shopping, D remained at home to watch her children. Also present in D's residence were children of the defendant.[7] The defendant, who lived across the street from D, observed the children playing in a canoe that was in the backyard. He became upset, began to yell at the children and ordered them to stop playing in the canoe. The defendant went over and then entered D's home, and started to berate her for allowing the children to play on the canoe.

D went upstairs to watch television, and the defendant, uninvited, subsequently followed her into the living room. D was sitting in a rocking chair, and the defendant stood behind her. He then proceeded to reach under her shirt and grope her breasts. D repeatedly asked him to stop and to leave her alone. She also informed the defendant that she would tell her boyfriend what he had done.

The defendant then proceeded to unbutton D's jeans and inserted his finger into her vagina. D told him to stop. She attempted to push him off, but was unable to do so due to the defendant's size and superior strength. The defendant took a folding knife out of a sheath that he carried on his belt and opened it,

---

[6] In keeping with our policy to protect the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom her identity may be revealed. See General Statutes § 54-86e.

[7] D's sister, who had been married to the defendant, testified that she separated from the defendant on June 9, 2000, and that they divorced on December 7, 2000. She also testified that during July, 1998, she and the defendant attended weekly counseling sessions.

exposing the blade. The defendant told her that he would kill her if she told anyone what had occurred.[8] He then placed the knife blade on D's chest, causing her pain, but did not use enough force to break the skin.

The defendant and D heard a motor vehicle arrive at the house. It was D's boyfriend and the other couple who lived with D returning from grocery shopping. The defendant folded the knife blade, placed it back in the sheath and left the victim's home.

D exhibited noticeable changes in her behavior after the July 15, 1998 assault. She became depressed, scared and withdrawn. On August 20, 1998, approximately five weeks after the defendant had assaulted her, D told her boyfriend and others about the sexual assault perpetrated by the defendant. D filed a complaint with the police department, and the defendant subsequently was arrested and charged.

After a jury trial, the defendant was convicted on all counts. The court sentenced him to an effective term of twenty years incarceration, suspended after twelve years, and ten years probation. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendant claims that the court improperly admitted into evidence acts of uncharged misconduct. Specifically, the defendant argues that the court should not have admitted evidence that he (1) threatened his former wife over the telephone after she refused to engage in sexual relations with him, and (2) used a knife to puncture the tire of his former brother-in-law's motor vehicle after an argument. We disagree.

As an initial matter, we set forth the applicable standard of review and legal principles that govern our

[8] The defendant testified that he earlier had demonstrated to D the technique he learned while serving in the military of how to use a knife to inflict fatal injuries if she needed to use a knife to kill someone.

resolution of the defendant's appeal. "As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Internal quotation marks omitted.) *State* v. *Torres*, 57 Conn. App. 614, 621, 749 A.2d 1210, cert. denied, 253 Conn. 927, 754 A.2d 799 (2000); see Conn. Code Evid. § 4-5 (a); C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.19.2, p. 232. "We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime." (Internal quotation marks omitted.) *State* v. *Colon*, 71 Conn. App. 217, 242, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002); see also Conn. Code Evid. § 4-5 (b).

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . .

"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . The problem is . . . one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree

to which the jury will probably be roused by the evidence." (Internal quotation marks omitted.) *State* v. *Yusuf*, 70 Conn. App. 594, 608, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002).

The following additional facts are necessary to the resolution of the defendant's appeal. On June 25, 2001, prior to the start of the trial, the defendant filed a motion in limine to exclude various uncharged acts of misconduct.[9] On July 9, 2001, the court held a hearing on the motion,[10] but refrained from issuing a ruling until it heard the testimony during the state's proffer. During the trial, the court heard testimony, outside of the presence of the jury, regarding various acts of uncharged misconduct perpetrated by the defendant.[11] The court admitted into evidence two instances of uncharged misconduct that are the subject of the defendant's appeal. Specifically, the court permitted testimony that the defendant had threatened his former wife, D's sister, over the telephone after she refused to engage in sexual relations with him and that he had used a knife after an argument with his former brother-in-law to puncture

[9] The record reveals that the defendant filed the motion on June 25, 2001, a memorandum of law in support of the motion on July 3, 2001, and an addendum on July 9, 2001.

[10] We note that during the oral argument on the motion in limine, the following colloquy took place:

"The Court: It's not a defense of identity? How could that—he's claiming that he wasn't the one who did this.

"[Defense Counsel]: Right.

"The Court: If it happened.

"[Defense Counsel]: Well—

"The Court: If it happened, he didn't do it.

"[Defense Counsel]: If it happened, we're saying he never did—

"The Court: Isn't that identity?

"[Defense Counsel]: That's correct."

[11] The court excluded from evidence several acts of uncharged misconduct by the defendant that the state had sought to elicit, including testimony that the defendant held himself out as an expert with knives, that he bragged about sexually assaulting a woman and then fabricating an alibi, and that he had committed spousal rape.

the tire of a motor vehicle the brother-in-law was using. The defendant's claims fail for two reasons. We conclude that the court properly admitted evidence concerning both instances of uncharged misconduct, but even if we assume arguendo that the admission of the evidence was improper, the error was harmless.

I

D's sister, the defendant's former wife, testified[12] that on April 22, 2001, approximately three months before the start of the defendant's trial, she received a telephone call from the defendant. During the conversation, the defendant stated that he wanted to engage in sexual relations with her. She informed him that she was not interested because she was involved in a relationship with another person at that time. The defendant replied that if she did not have sex with him, he would make her life miserable and make it hard for her to live. She continued to decline his invitation to resume physical relations with him. He threatened her again by stating that he would find the person she was involved with and inform him falsely that she recently had resumed a sexual relationship with the defendant.[13]

---

[12] D's sister initially testified outside of the presence of the jury. After the court overruled defense counsel's objection, she repeated her testimony in front of the jury.

[13] We note that subsequent misconduct by the defendant is relevant to the issue of identity and that whether that misconduct occurred prior to or subsequent to the crimes with which the defendant was charged in this case has no bearing on the admissibility of the subsequent misconduct. See *State* v. *Smith*, 198 Conn. 147, 157, 502 A.2d 874 (1985); *State* v. *Labbe*, 61 Conn. App. 490, 494–95, 767 A.2d 124, cert. denied, 256 Conn. 914, 773 A.2d 945 (2001); In *State* v. *Lepri*, 56 Conn. App. 403, 743 A.2d 626, cert. denied, 253 Conn. 902, 753 A.2d 938 (2000), this court stated that "[i]n Connecticut, as in almost all other jurisdictions, [e]vidence of crimes subsequent to the crime charged are also admissible for the same purposes as those committed prior to the charge." (Internal quotation marks omitted.) Id., 408–409; see also C. Tait, supra, § 4.19.2, p. 233 ("[t]o be relevant, the misconduct need not be prior in time. Evidence of crimes subsequent to the crime charged is also admissible for the same purpose as that of crimes committed prior to the charge").

The court found that the threatening telephone call made by the defendant to D's sister was relevant to the issue of identity because the incidents shared several similar characteristics: (1) D and her sister were unmarried at the time they were threatened by the defendant; (2) both women previously had been related to the defendant by a marital relationship—D's sister was the defendant's former wife, and D was his former sister-in-law; (3) both women lived near the defendant; (4) the defendant was superior in strength to D and her sister; (5) the defendant knew that both of the women were mentally handicapped and were supported by supplemental security income as a result of their disability; (6) both women were similar in age; (7) the defendant used threats to impose his will and domination over the women to achieve his goal of sexual gratification; and (8) the defendant made no effort to conceal his identity from the women.

In *State* v. *Jones*, 205 Conn. 638, 534 A.2d 1199 (1987), our Supreme Court stated: "It is not enough that the two offenses are similar. To establish a common design, the characteristics of the two offenses must be sufficiently distinctive and unique as to be like a signature. . . . *On the other hand, the inference need not depend upon one or more unique features common [to both offenses], for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 661; see also *State* v. *Figueroa*, 235 Conn. 145, 163–64, 665 A.2d 63 (1995). The *Jones* court concluded that the amount of force, the vulnerability of the victims and timing of the attacks were sufficiently similar to be probative of identity or of a common scheme. *State* v. *Jones*, supra, 662–63. This court, in *State* v. *Labbe*, 61 Conn. App. 490, 767 A.2d 124, cert. denied, 256 Conn.

914, 773 A.2d 945 (2001), upheld the trial court's admission into evidence of uncharged misconduct where "both [incidents] involved the defendant's exposing himself in a similar manner from within his vehicle, through an open window, to women whom he had initially located in rest areas along interstate highways in Connecticut." Id., 495; see also *State* v. *Cook*, 70 Conn. App. 114, 118–19, 796 A.2d 1269 (2002) (holding that use of shotgun, bandana in two different robberies relevant to issue of identity).

The defendant argues that the similarities in this case are not sufficiently unique to warrant an exception to the general rule that acts of uncharged misconduct are inadmissible. We note, however, that the number of substantial similarities between D and her sister resulted in a distinctive combination that was relevant to the identity of the individual who assaulted D. That combination resulted in a unique pattern of victim selection, a " 'signature' " or " 'criminal logo' "; *State* v. *Carsetti*, 12 Conn. App. 375, 382, 530 A.2d 1095, cert. denied, 205 Conn. 809, 532 A.2d 77 (1987); that was relevant to the issue of identity. "The process of construing an inference of [i]dentity . . . consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated. The process thus corresponds accurately to the general principle of relevancy. 2 Wigmore, Evidence (Chadbourn Rev. 1979) § 411." (Internal quotation marks omitted.) *State* v. *Braman*, 191 Conn. 670, 679, 469 A.2d 760 (1983); see *State* v. *McClendon*, 45 Conn. App. 658, 676, 697 A.2d 1143 (1997), aff'd, 248 Conn. 572, 730 A.2d 1107 (1999); *State* v. *Henry*, 41 Conn. App. 169, 178, 674 A.2d 862 (1996).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 685–86, 800 A.2d 1160 (2002). It is axiomatic that the "state may introduce all legally competent evidence which aids the trier of fact in determining the relevant issues." (Internal quotation marks omitted.) *State* v. *Smith*, 198 Conn. 147, 156–57, 502 A.2d 874 (1985). We conclude that on the basis of the number of similarities between D and her sister, the court did not abuse its discretion when it determined that the threatening telephone call made by the defendant to D's sister was relevant to the issue of the identity of the person who assaulted D.

Our analysis, however, is not complete. We must address the second prong, that is, whether the prejudicial impact of the uncharged misconduct outweighed its probative value. We conclude that it did not.

The court carefully considered the prejudicial effects of the evidence of the threatening telephone call. The court heard argument pertaining to the defendant's motion in limine prior to the start of the trial. The court heard the testimony of D's sister outside the presence of the jury prior to overruling the defendant's objection. The court properly issued a limiting instruction to the

jury regarding the use of the uncharged misconduct.[14] The court also refused to admit into evidence other proffered instances of uncharged misconduct by the defendant, namely, the testimony of D's sister regarding an incident of spousal rape and the testimony of D's boyfriend regarding the defendant's fabrication of an alibi after the defendant had sexually assaulted another woman.

We also note that the uncharged misconduct, although relevant to the issue of intent, involved a threat made over the telephone to D's sister. The jury heard detailed testimony from D concerning the manner in which the defendant sexually assaulted her. Given the graphic nature of the sexual assault, we conclude that D's sister's testimony regarding the threats made by the defendant over the telephone was unlikely to arouse the jury's emotions of hostility and prejudice. See *State* v. *Greene*, 69 Conn. App. 463, 471–72, 794 A.2d 1092, cert. denied, 260 Conn. 934, 802 A.2d 89 (2002).

The defendant, in pressing his claim of improper admission of the misconduct incidents, relies heavily on *State* v. *Faria*, 47 Conn. App. 159, 703 A.2d 1149 (1997), cert. denied, 243 Conn. 965, 707 A.2d 1266 (1998). In *Faria*, the defendant was charged in a two part information. The first part charged him with the crimes of kidnapping in the first degree, attempt to

---

[14] The court, during its charge to the jury, stated: "You may not consider evidence of prior misconduct even for the limited purpose of attempting to prove the crimes charged in the information because it may predispose your mind uncritically to believe that the defendant may be guilty of the offenses here charged merely because of the alleged prior misconduct. For this reason, *you may consider this evidence only on the issues of the existence of the intent, which is a necessary element of the crime charged, the identity of the person who committed the crime . . . and for no other purpose.*" (Emphasis added.) It is well established that "[u]nless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions." (Internal quotation marks omitted.) *State* v. *Coughlin*, 61 Conn. App. 90, 96, 762 A.2d 1 (2000), cert. denied, 255 Conn. 934, 767 A.2d 105 (2001).

commit sexual assault in the first degree and sexual assault in the third degree, and the jury returned a guilty verdict on all counts. Id., 161. The second part of the information charged the defendant with being a persistent serious felony offender to which he pleaded guilty. The trial court admitted evidence of uncharged misconduct, specifically, regarding the defendant's actions with a prostitute. This court, recognizing that the decision was " 'a close call' "; id., 170; concluded that although the uncharged misconduct was relevant to at least one of the exceptions to the general rule that uncharged misconduct is inadmissible, "the prejudicial effect of the other misconduct evidence outweighed its minimal probative value and that its admission into evidence constituted an abuse of the trial court's discretion." Id., 175.

A close examination of *Faria*, however, demonstrates that it is factually distinguishable from this case. In *Faria*, the defendant assaulted the victim, whom he knew casually, after an evening during which he had consumed a number of alcoholic beverages in a pub in the company of the victim. Id., 163–65. Within hours of the assault, the victim informed her husband, the police were called and the defendant was arrested. Id., 165–66. The uncharged misconduct evidence involved the defendant's contacting a prostitute, who was a drug addict, and with whom he had consensual sex in the time period after he had assaulted the victim, but before he was arrested. Id., 166–67. He paid the prostitute $20 to perform oral sex on him. Id., 167. She testified that the defendant was very forceful and aggressive when she performed oral sex on him. Id. The uncharged misconduct in *Faria* involved the defendant's business transaction with a prostitute, while the charged misconduct concerned the defendant's assault of a victim with whom he had a social relationship. Id., 173. In the present case, however, both the charged and uncharged

misconduct overall concerned the defendant's social relationships.

Moreover, the testimony in *Faria* regarding the defendant's interaction with the prostitute revealed extraneous information that the prostitute was a drug user, had recently been raped and that the defendant had scared her. Id., 167. That additional information was likely to rouse the emotions of the jury. Id., 175. The *Faria* court concluded that "the prejudicial effect of the other misconduct outweighed its minimal probative value and that its admission into evidence constituted an abuse of the trial court's discretion." Id. In the present case, however, we have determined that the prejudicial effect of the evidence of the uncharged misconduct did not outweigh its probative value. Therefore, we consider that the defendant's reliance on *Faria* is misplaced.

We conclude that the court did not abuse its discretion in finding that the probative value of the evidence regarding the threatening telephone call outweighed its prejudicial impact. The court, therefore, properly admitted the evidence of uncharged misconduct.

## II

The defendant also argues that the court improperly admitted evidence that he had used a knife to make a threat against D's brother and to puncture a tire on the automobile that the brother was operating. The defendant, on cross-examination, testified that in 1998, D's brother had parked in the defendant's assigned parking space in the apartment building where he lived. The defendant requested that D's brother move the motor vehicle so that the neighborhood children would be able to continue playing there. D's brother told the defendant that he would not move the motor vehicle.

The defendant was angry and aggravated by D's brother's refusal to move the motor vehicle.[15]

The defendant entered his house and obtained one of his knives. He went back outside and stabbed the blade of the knife into one of the tires on D's brother's motor vehicle. The defendant told D's brother that "if you don't move, I'm going to stab another one." He proceeded to remove the knife from the tire, placed it back in its sheath, and returned inside.[16]

At the outset, we must identify the scope of our review of the defendant's claim of error. The motion in limine filed by the defendant did not address the uncharged misconduct with respect to the slashing of D's brother's tire.[17] During the hearing regarding the defendant's motion in limine, defense counsel objected solely on the basis of relevance.[18] Finally, during the

[15] On cross-examination of the defendant in the context of D's brother's refusal to move his car, the following colloquy took place:

"[Prosecutor]: And if they don't, they're going to get the point, right?

"[Defendant]: Usually, when I ask people to leave, sir, they used to do it when I say it.

"[Prosecutor]: Why is that?

"[Defendant]: Well, I guess because of the size of me, sir. Everybody says I always intimidate people. They all heard the testimony. Everybody says that I'm an intimidating person."

[16] During cross-examination concerning the tire slashing incident, the following colloquy took place:

"[Prosecutor]: D found out what you did to [D's brother's] car. Yes? Killing a tire?

"[Defendant]: As a matter of fact, I think D was at the house when it happened, too, if I'm not mistaken.

"[Prosecutor]: She might have witnessed this whole thing?

"[Defendant]: I'm pretty sure if I'm not mistaken, because I think D was there . . . ."

[17] The defendant's motion was captioned "Defendant's Motion in Limine RE: Exclusion of Any Testimony of [D's sister] Relating to Allegations of Uncharged Misconduct by the Defendant."

[18] Defense counsel stated: "Just that the state indicates they want to call [D's brother] in an incident that supposedly—well, it did occur prior, whereas, I believe, charged with criminal mischief and breach of the peace. The state seeks to introduce that in reference to the defendant's character and reputation. And stating that a knife was used in that case and brandished,

state's cross-examination of the defendant, defense counsel's sole objection was that the questions pertaining to the tire slashing incident were irrelevant.

We previously have noted that "[o]ur rules of practice require that a proper objection be made, setting forth the grounds on which the evidence is claimed to be inadmissible and an exception taken to the ruling of the trial court. Practice Book § 288 [now § 60-5]. Here, the only objection set forth by the defendant was a claim that the evidence was irrelevant. We review evidentiary rulings solely on the ground on which the party's objection is based. . . . Although the defendant preserved his claim as to the relevancy of the misconduct evidence, nothing in the record indicates that the defendant ever raised as a ground of objection before the trial court that the prejudicial effect of the misconduct evidence outweighed its probative value. We have not yet reached a jurisprudential stage where we require trial judges to be mentally telepathic. Thus, we have consistently declined to review claims based on a ground different from that raised in the trial court." (Citations omitted.) *State* v. *Ulen*, 31 Conn. App. 20, 27–29, 623 A.2d 70, cert. denied, 226 Conn. 905, 625 A.2d 1378 (1993); see also *State* v. *Collins*, 68 Conn. App. 828, 843, 793 A.2d 1160, cert. denied, 260 Conn. 941, 835 A.2d 58 (2002); C. Tait, supra, § 1.30.1, pp. 88–89. We will, therefore, confine our review of the defendant's claim solely to whether the act of slashing the tire of D's brother's motor vehicle was relevant to the issue of the identity exception to the general rule that evidence of uncharged misconduct is inadmissible.

Our review of the record reveals the following similar characteristics between the July 18, 1998 sexual assault and the 1998 tire incident: (1) both individuals were

but it was not used on any person, only to slash a tire. I don't see how that's relevant as an act of misconduct, which is similar to the case at hand."

related to the defendant as a result of his marriage to D's sister; (2) the defendant made no effort to conceal his identity from either person; (3) the defendant used a knife in an effort to ensure compliance and to impose his will over both D and D's brother; and (5) both incidents occurred near the defendant's residence.

On the basis of the aforementioned similarities, we cannot say that the court abused its discretion when it determined that the tire incident was relevant to the issue of the identity of the person who assaulted D. The combination of the numerous factors resulted in a unique logo or signature. See *State* v. *Jones,* supra, 205 Conn. 661–63; *State* v. *Figueroa,* supra, 235 Conn. 163–64; *State* v. *Cook,* supra, 70 Conn. App. 118–19; *State* v. *Labbe,* supra, 61 Conn. App. 495. Accordingly, we conclude that the court did not abuse its discretion when it admitted evidence regarding the 1998 tire incident.

### III

The state, in its brief, argues that even if the court improperly admitted the evidence concerning the uncharged acts of misconduct committed by the defendant, such error was harmless because his credibility had been impeached. We agree.

"Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result. . . . Furthermore, [t]he ruling of the trial court in order to constitute reversible error must have been both incorrect and harmful. . . . The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result?" (Citation omitted; internal quotation

marks omitted.) *State* v. *Lewis*, 67 Conn. App. 643, 653–54, 789 A.2d 519, cert. denied, 261 Conn. 938, 808 A.2d 1133 (2002).

Our review of the record reveals that the jury heard credible testimony from D regarding the details of the sexual assault. It was, therefore, within the province of the jury to credit her testimony and to disregard the testimony of the defendant. "[The jury] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the [jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [jury] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Senquiz*, 68 Conn. App. 571, 576, 793 A.2d 1095, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002). Moreover, the jury heard testimony from three witnesses that placed the defendant at the home of D near the time the sexual assault occurred. That testimony contradicted that of the defendant, who claimed that he was not at D's home at the time of the assault. Last, numerous witnesses testified that the defendant regularly carried a knife in a sheath on his belt. That testimony supported D's testimony that the defendant had threatened her with a knife after sexually assaulting her.

Furthermore, we cannot say, on the basis of our review of the record, that the testimony regarding either act of uncharged misconduct was so prejudicial as to affect the result of the trial. First, we note in both instances that the defendant failed to request a limiting instruction at the time the jury heard the evidence. Second, although a limiting instruction never was requested by the defendant, the court gave a limiting instruction during its charge to the jury. Third, the acts of uncharged misconduct, albeit serious in nature, paled in comparison to the graphic and detailed description

of the sexual assault given by D. We conclude, therefore, that the defendant failed to prove that the admission of evidence regarding the acts of uncharged misconduct affected the result of the trial.

The judgment is affirmed.

In this opinion the other judges concurred.